Houston East & West Texas Railway Company v. John Kopinitsch et al.

No. 4122.   Decided February 18, 1925.

(268 S. W., 923).

**Negligence—Discovered Peril.**

Evidence here considered is held sufficient to raise the issue of negligence of defendant after discovery of peril, in a case of collision of a train with an automobile, where the fireman saw the car slowly approaching the crossing, but, assuming that it would stop, did not call the engineer's attention to it. (Pp. 369-375).

Question certified from the Court of Civil Appeals for the First District, in an appeal from Harris County.

The Supreme Court, having referred the question to the Commission of Appeals, Section A, for their opinion thereon, here adopt same, to be certified as their answer.

*Baker, Botts, Parker & Garwood,* and *Garrison & Watson,* for appellant.

In all civil cases, the trial court is authorized to submit only controverted issues of fact, and where there is no substantial evidence tending to establish the issues of fact upon which plaintiff seeks to recover, it is the duty of the trial court to give a peremptory instruction in favor of the defendant. Bennett v. St. L. S. W. R. Co., 36 Texas Civ. App., 459; Ft. W. & D. C. R. Co. v. Shetter, 94 Texas, 196; Fontana v. P. A. T. Co., 235 S. W., 1098; G. & C. S. F. R. Co. v. Abendroth, 55 S. W., 1122; G. H. & S. A. R. Co. v. Ryon, 80 Texas, 61; G. H. & S. A. R. Co. v. Polk, 63 S. W., 343; G. H. & S. A. R'y Co. v. Price, 240 S. W., 526; Haass v. G. H. & S. A. R'y Co., 24 Tex. Civ. App., 135, 57 S. W., 855; H. & T. C. R. Co. v. O'Donnell, 92 S. W., 409; H. E. & W. T. R'y Co. v. Barron, 235 S. W., 335; I. & G. N. v. Edwards, 100 Texas, 22, 93 S. W., 106; L. & W. R'y Co. v. Jones, 233 S. W., 368; M. K. & T. R'y v. Martin, 44 S. W., 703; Pillow v. Texarkana & Ft. Smith R'y Co., 119 S. W., 128; S. & E. T. R'y. v. Dean, 76 Texas, 73, 13 S. W., 45; T. & P. Ry. Co. v. Marrujo, 172 S. W., 588; T. & P. v. Fuller, 5 Tex. Civ. App., 660, 24 S. W., 1090; T. & N. O. Ry. v. Brown, 2 Tex. Civ. App., 281, 21 S. W., 424; T. & N. O. R'y Co. v. Wagner, 224 S. W., 377; Railway Co. v. Ryon, 15 S. W., 588; Railway Co. v. Boyd, 101 Texas, 411; Sanches v. S. A. R'y Co., 3 T. C. A., 89; Sanches v. S. A. & A. P. R'y Co., 88 Texas, 117, 30 S. W., 431; Schaff v. Gooch, 218 S. W., 783; St L. S. W. Ry. v. Branom, 73 S. W., 1064; St. L. B. & M. R'y v. Paine, 188 S. W., 1033.

*Woods, King & John,* for appellees.

On sufficient evidence to support the findings, the jury having found in answer to special issues three and four that appellant's fireman on the engine which struck the automobile in which deceased was riding, killing deceased, discovered the peril of the said Shandor Kopinitsch in such time as that he could, in the exercise of ordinary care, have given warning to the engineer so that the engineer, in the exercise of ordinary care, either by the sounding of the whistle to give warning of the approach of the train, or by the use of ordinary care, and consistent with safety to the train and its passengers, could have stopped the train, either or all, in time to have prevented the injury to or death of deceased, Shandor Kopinitsch, appellees are entitled to an affirmance of the judgment on the issue of discovered peril. Trochta v. Railway Co., 218 S. W., 1038; Verble v. Schaff, 251 S. W., 1023; H. & T. C. v. Finn, 107 S. W., 100; H. & T. C. v. Finn, 101 Texas, 511, 109 S. W., 918; M. K. & T. v. Reynolds, 103 Texas, 31, 122 S. W., 531; Hines v. Arrant, 225 S. W., 769; G. H. & H. v. Sloman, 244 S. W., 268.

MR. JUDGE BISHOP delivered the opinion of the Commission of Appeals, Section A.

The Court of Civil Appeals for the First Supreme Judicial District has certified to the Supreme Court the question as to whether the evidence hereinafter quoted presents for the jury the issue of discovered peril. The evidence is as follows:

"Mitchell, the driver of the automobile, testified:

"'The accident happened, I would judge, between eight thirty and nine o'clock in the morning; at the crossing that I understand was at Mount Houston. At the time the train collided with said automobile at the crossing I was driving the automobile, and the first I knew of the approach of the train was just before it struck the automobile. When I first drove up on the right of way where I could see I looked both ways and didn't see anything and then I' drove up on the crossing and was struck. It was a passenger train. I did not hear any alarm at all given by said train as it approached the crossing; I did not hear the bell rung or the whistle blown on said engine or train before it collided with the automobile. In approaching said crossing I was driving the automobile at, I judge, five or six miles an hour. I could not estimate exactly the speed the engine and train was going when it collided with the automobile, but it was running very rapidly. Within my knowledge the speed had not been slackened or lessened any before it struck the automobile. There was nothing on the track or right of way in approaching this crossing from the direction in which the train was coming to obstruct the view looking this way of those on the engine. The approach to the crossing was sandy and cut out in ruts. * * *

"'The railroad track, I judge, was straight where it approached said crossing from the direction the train was coming from. I really could not say for what distance the railroad track was straight, but I judge it to be a considerable distance, and I would judge it was down grade.'"

"D. Mullins, fireman on appellant's train at the time, testified:

"'On the 6th day of November, 1921, I was the fireman on the passenger train coming from Shreveport to Houston, where there was an accident out at North Houston. Mr. Sid Reynolds was the engineer that morning. The train was late that morning. I don't remember whether the schedule has been changed since that time or not, but if it has not been changed the train was due to arrive here about seven-forty, I believe. The accident happened about nine o'clock that morning out about nine miles from Houston. We were something like one hour and forty-five minutes late. After the train left Humble that morning it had stopped before it reached the point where the accident happened; it had stopped at the Mount

Houston Station, and the accident happened after we left that station, just about one mile this side of Mount Houston towards Houston.
\*    \*    \*

"Coming into Houston on that train I was on the left hand side, or the east side of the locomotive, the engineer being on the opposite side. The crossing where the accident happened has no name that I know of; all of the officials say it is a private road crossing. I do not know where the road that crosses there runs from and where it runs to. It is not a shell road, it is a dirt road and runs directly across the track, and after it crosses the track it curves south, and gets off of the right of way proper. The east side of the track, that is open territory there; the main road turns, I believe, north, but there is an opening there; you can go either way you want to after you pass the right of way fence. I mean that on the east side that it opens out, there is open territory there and you can go either direction you want to. The right of way between Mount Houston and this crossing is fenced on both sides and the fence is something like fifty feet from the track on either side. The right of way between the fence and the track for about one-fourth or one-half of a mile back towards Mount Houston from this crossing is perfectly clear. The track from Mount Houston down to this crossing is a straight track and there are no obstructions on the right of way from Mount Houston to this crossing to prevent anyone from seeing. The track is practically level, it might be inclined to be a little bit down grade, but if so, a very small per cent. On this side of the crossing, coming on down towards Houston, the county is just level. There are some bushes, after you cross the crossing; there is a wagon road runs along with the right of way fence on the east side of the right of way fence, and outside of the road there is some small bushes and trees. Coming from Humble towards this crossing, those trees would be something like one hundred feet, I should judge, to my left from the crossing; they are just small trees and brush. That condition does not exist all the way from the point of the accident back up the right of way to Mount Houston, but just part of the way; I should say about one-fourth of a mile, perhaps a little more. \*  \*  \*

" 'I first observed this automobile the morning of the accident when we were just about one-fourth of a mile from the crossing. something like one thousand feet. The automobile at that time was standing a little bit east of the crossing; he was in the act of turning the car around, it looked to me like; I saw him cut the wheels around towards the track and pull up towards the track at a very slow speed. At that time he was something like sixty feet from the crossing, I should judge, and we were about a thousand feet, or one-fourth of a mile, from the crossing at that time. The train was

running about forty miles an hour. I saw him at a point about sixty feet from the crossing, over on the east side of the track, saw him pull the car around and start towards the crossing; I believe he was really standing still when I first saw him, and I saw him start immediately thereafter towards the crossing, in low speed, it seemed to me. I think he was running in low; I have driven a Ford car a good deal, and I think he was running in low. He continued on toward the crossing and I watched him all the time as he continued on towards the crossing. I did not tell Mr. Reynolds that I saw him, did not call his attention to the fact that I saw him. I saw him when he pulled right up on the crossing and the back end of the car was just about even with me, I guess, when the engine hit. There were three men inside of the car and one sitting on the side door, one boy sitting on the side. There was no change in the speed of the train from 40 miles an hour from the time I first saw him until the accident occurred. When the driver of the car got upon the track he tried to speed across. I mean by that that he speeded up the car just as he got on the track, after he got the front wheels on the track. I mean that you could see the car give a little increase in its rate of speed. But from the time I first saw him sixty feet from the track, when I think he was standing still, until he got the front wheels on the crossing, there was no change in his speed. he was running slowly and going directly towards the track. When I first saw him I was about one-fourth of a mile from the crossing, about one thousand feet, about that, and I did not notice any effort of his to stop after I first saw him start towards the crossing. I could see him going towards the crossing but I thought he was going to stop; I thought he was going to pull up beside the track and stop and that is the reason I didn't say anything to Mr. Reynolds. But after he got on the track he speeded up and tried to get across. * * *

"I have run a passenger engine; I have run a passenger engine about three months and have fired on an engine. I do not know the distance that an emergency stop could be made in going at the rate of speed we were going at that time, but I do know the distance we ran after we hit him. We ran six car lengths by the wreck, that is. the rear end of the train was one car length from the crossing when we stopped and we had five cars in the train that morning, if I am not mistaken. I guess those cars are about 60 feet long. We run the length of the engine and five cars and the rear of the train was about a car length from the crossing—or the rear of the train was about one car length beyond where we hit him, making about six car lengths in which we stopped. The engine and tender are not as long as a coach. Five cars and the length of the engine and tender

would be about 400 feet. We were running about 40 miles an hour when we hit him and stopped in about 400 feet. * * *

"There was no change at all in the man's driving from the point I first saw him until he looked to me like he tried to get across the track, there was no change in his speed, and he was moving at a very slow rate of speed during all of that time. As he got the front wheels on the track he tried to speed up but he did not make it across. Mr. Reynolds did not see him, it was on my side. I did not tell him that a car was approaching the crossing. I knew it was a road crossing and blowed for it. I had never seen anybody cross there before, but I knew it was a road crossing. From the time I first saw the automobile until he got the front wheels on the track, it was running about three or four miles an hour, and when he spurted up he got about from four to six feet before he was hit. * * *

"The reason I did not say anything to Mr. Reynolds was because I expected them to stop before they reached the crossing; the reason I thought he would stop was because he was moving slowly, moving in slow speed. I was simply taking a chance that he would stop because I saw other people stop and we couldn't afford to stop every time we saw an automobile drive up towards the track, they do that every day and stop. That is the reason I didn't say anything to Mr. Reynolds, he was moving at such a slow rate of speed that I thought he would drive up to the crossing and stop. I based my judgment on the rate of speed that he was going. There was no difference in the rate of speed from the time I first saw him until the front wheels were on the track, he was running at a slow rate of speed, just hardly moving along. He was just hardly moving along during that time and my best judgment was when I first saw him that he was stopped and turned and drove along slowly that sixty feet to the track."

"M. S. Runnels, referred to by the fireman as Sid Reynolds, testified to this effect:

"I blew the whistle just about the time I got opposite the whistling post (about 80 rods or 1320 feet north of the crossing). I blew two short and two long blasts of the whistle. I commenced blowing the whistle just about the time I got even with it. That whistling post is about seven telegraph poles from the crossing. I did not blow any more before the accident because I didn't know anything about them. After hitting the car I ran three hundred and ninety-eight feet. * * *

"When we were one thousand feet from the crossing, if the fireman had told me there was a car approaching the crossing as if it was going across, I would have gone to work to try to stop my train of course.'"

"C. B. Larch, a bystander, who was about 300 yards from the crossing, testified as follows:

" 'The engine always whistles some six or eight telegraph poles before it gets to the whistling board, it always does that, as near as I can get at it by hearing it whistle. I could not tell you how many telegraph poles the train was from the crossing when it whistled, but maybe I can give you some idea. It was about four telegraph poles from me to the crossing, and about two telegraph poles from me up to the whistling post; that would be six telegraph poles, and is must have been a couple of telegraph poles above the whistling post when it whistled. * * *

"After the engine whistled 700 yards back up the track it did not whistle any more, I never heard it whistle any more after that. That is the only thing I heard it do, was to whistle back up there about 700 yards. I did not hear the bell ringing; I don't know whether it was ringing or not, but I didn't hear it ringing and wouldn't say about that. * * *

"The train came right on by where I was and over this crossing and it stopped after it hit the car. Before it hit the car it did not slow down at all.' "

"The conductor on the train, Mr. Allen, testified to this effect:

" 'The only thing to attract my attention to the accident was the sudden application of the brakes and about the same time a cloud of dust went by me and I knew we were in a jam of some kind. The passengers were raising the windows and looking out and there was the usual little commotion incident to such an occurrence. I did not hear any whistling or anything of the kind. I was within about 120 feet of the engine.' "

Under this evidence could it be said that it would have been reasonably apparent to a person of ordinary prudence in the use of ordinary care situated as was the fireman that those in the automobile were not aware of the approach of the train? If it could, it would be within the province of a jury to say whether it was apparent to the fireman that the driver of the automobile was ignorant of the fact that the train was approaching the crossing. The fireman was looking at the automobile from the time it turned around and started toward the crossing until it passed in front of the engine and was struck. The car was only 60 feet from the crossing when put in motion. At the time the fireman first saw it the engineer had already whistled for the crossing. The fact that at a distance of only 60 feet the driver of the automobile put same in motion with the evident intention of crossing the railroad track would, we think, be evidence from which a jury would be permitted to infer that it occurred to the fireman that the driver of the car had not heard the whistle and was ignorant of the approach of the train.

If it was known to the driver of the car that the train was approaching would he have advanced toward the track and again stopped, or would he have remained where he was first seen by the fireman until the train passed? The fireman saw the automobile put in motion and watched it approach the crossing at a speed estimated as high as 6 miles per hour without diminishing its speed until it ran in front of the train and was struck. From the facts it may also have occurred to the fireman that if the driver of the car saw the train and desired to do so, he could, by increasing the speed at which he was traveling, cross the track in front of the train without danger, as the train was one-fourth of a mile, or one thousand feet from the crossing. His failure to do this might have indicated to the fireman that he did not know the train was approaching.

At some time while the fireman watched the car approach he may have apprehended that the occupants thereof would be placed in peril. Just at what time it first occurred to the fireman that there was danger to those in the automobile under the facts in evidence, and whether it was when the car was at such distance from the crossing that stopping the train, or diminishing its speed, or blasts from the whistle, in the exercise of ordinary care would have prevented the collision, is we think, an issue of fact.

In the case of Hines v. Arrant, 225 S. W., 767, by the Court of Civil Appeals of the Sixth District, in which writ of error was refused, the facts being similar to those here presented, Justice Hodges uses this language:

"Was the evidence sufficient to justify the jury in finding that the engineer saw the appellee's peril in time to have avoided the collision? The testimony warranted the inference that the engineer was looking ahead to ascertain if the crossing was clear, and that there was no obstruction to prevent him from seeing the appellee as he neared the crossing. While the engineer testified that he did not see the appellee's danger until the latter was on the track, there were circumstances which indicated that he did. If he was keeping a lookout as he says he was, it is difficult to understand how he could have failed to see an automobile approaching and close to the crossing in time to give a warning by blowing the whistle or ringing the bell. According to the findings of the jury, he did see the appellee, and he failed to give any warning of the train's approach. The train was at the time going downgrade, and made less noise than is usually made by a steam locomotive. The appellee might have been stopped within a few feet of the crossing had he heard the whistle or the bell. It has been decided by the Supreme Court and by this court that under circumstances similar to this the denial of the engineer that he saw a party in danger is not conclusive of that question. Brown v.

Griffin, 71 Tex., 654, 9 S. W., 546; Ry. Co. v. Finn, 107 S. W., 94; T. & N. O. Ry. Co. v. House, 208 S. W., 358; Trochta v. Ry. Co., supra.''

As also sustaining the view that the evidence here presents the issue of discovered peril as one of fact for a jury, we refer to the case of H. & T. C. Ry. Co. v. Finn, 101 Texas, 511, 109 S. W., 918, in which Chief Justice Gaines refers to the facts pointed out by the Court of Civil Appeals in its opinion, 107 S. W., 94, and says:

''Being now of the opinion that there was some evidence to justify the jury in finding that the servants of the company discovered that the plaintiff was about to go into a place where he would be in danger of being struck by the cars, in time to have avoided the injury by means within their power, we deem it a profitless task to discuss the question.''

See also Verble v. Schaff, 251 S. W., 1023; St. L. S. W. Ry. Co. v. Ford, 237 S. W., 655; Trochta v. M. K. & T. Ry. Co., 218 S. W., 1038; Texas C. Ry. Co. v. Dumas, 149 S. W., 547.

We therefore recommend that the answer to the question certified be that the evidence did raise for the jury the issue of discovered peril.

The opinion of the Commission of Appeals answering the certified question is adopted and ordered certified to the Court of Civil Appeals.

*Thos. B. Greenwood,* Associate Justice.
*William Pierson,* Associate Justice.