MISSOURI, KANSAS & TEXAS RAILWAY COMPANY OF TEXAS v.
MRS. I. E. CUNNINGHAM ET AL.

No. 5085. Decided January 22, 1930.
(23 S. W., 2d Series, 343.)

608

*F. B. Walker* and *Thompson & Barwise,* for appellant.

The duties imposed by the doctrine of discovered peril do not arise until there is an actual discovery of peril and until there is a realization of peril. S. A. & A. P. Ry. Co. v. McMillan, 100 Texas, 562; H. & T. C. Ry. Co. v. O'Donnell, 99 Texas, 636; Schaff v. Gooch, 218 S. W., 783; Pillow v. Railway Co., 119 S. W., 128; San Antonio Traction Co. v. Kelleher, 107 S. W., 64; G. H. & S. A. Ry. Co. v. Price, 240 S. W., 525.

The authorities bear out the proposition that the engineer had the right to assume that the deceased would stop before going upon the railroad track, and the right to such assumption continued until it became reasonably apparent to the engineer that the said deceased did not intend to do so. Northern Texas Traction Co. v. Mullins, 99 S. W., 333; Fontana v. Port Arthur Traction Co., 235 S. W.,

1098; S. A. & A. P. Ry. Co. v. McMillan, 100 Texas, 562; Fort Worth & Denver City Ry. Co. v. Shetter, 94 Texas, 196; I. & G. N. Ry. Co. v. Garcia, 75 Texas, 591.

The evidence in this case does not raise the issue of discovered peril. T. & N. O. Ry. Co. v. Wagner, 262 S. W., 902, and many cases there cited; G. H. & S. A. Ry. Co. v. Price, 240 S. W., 525; G. H. & S. A. Ry. Co. v. Sloman, 244 S. W., 268 (writ of error refused). See also authorities supra.

A party defendant upon proper request is entitled to have all of its defenses submitted to the jury in an affirmative manner where such defenses are raised both by the pleadings and by the evidence, and in this case this appellant was entitled to have submitted to the jury its requested issue inquiring as to whether the deceased attempted to beat the train across the track, and as to whether such was negligence and the sole cause of his death, because such issue was raised by the pleadings and evidence, and if answered favorably to this appellant would have constituted a complete defense and hence its refusal was error. Missouri, K. & T. R. Co. v. McGlamory, 89 Texas, 635; Galveston, H. & S. A. Ry. Co. v. Washington, 90 Texas, 510; Fox v. Dallas Hotel Co., 111 Texas, 467; C. & S. Ry. Co. v. Rowe, 238 S. W., 908; Armour & Co. v. Morgan, 108 Texas, 417.

The general instruction immediately preceding special issue 14 of his charge is on the weight of the evidence in assuming that appellant in such manner or way was negligent and by such negligence caused the deceased to be surrounded by circumstances which appeared to him to threaten the destruction of his life. Article 2185, Revised Statutes of 1925; T. C. Ry. Co. v. Waldie, 101 S. W., 517; Stooksbury v. Swan, 85 Texas, 563; M. K. T. R. Co. v. Wolf, 89 S. W., 778.

A case being submitted to the jury upon special issues it is error for the trial court to give to the jury a general charge except in explanation and definition of legal terms used, and since this case was submitted to the jury on special issues the trial court committed error in its general instruction to the jury as set out preliminary to issue 14, such general charge being neither an explanation nor a definition of any legal term used by the court. Humble Oil & Ref. Co. v. McLean, 280 S. W., 557; Freeman v. G. H. & S. A. Ry. Co., 287 S. W., 902.

The evidence in this case, as shown by the court's certificate, we respectfully assert raises the issue that the deceased attempted to beat the train across the track, and that such attempt was the

sole cause of the accident and his death. That appellant was entitled to this issue we think is clearly shown by reference to the following cases: Northern Texas Traction Co. v. Woodall, 299 S. W., 220; Montrief and Montrief v. Bragg, 2 S. W. (2nd), 276; Armour & Company v. Morgan, 108 Texas, 117.

*Raymond Buck,* for appellee.

There being abundant evidence in the record that the engineer saw the deceased approaching the track under such circumstances as would make it appear probable to a reasonably prudent man in his position that deceased would attempt to cross the track ahead of the train and be struck, and deceased was thereafter struck and killed as a result of the engineer's failure to warn deceased or attempt to arrest the speed of the train at a seasonable time, the court did not err in refusing to sustain appellant's motion for an instructed verdict, or in submitting the issue of discovered peril to the jury. Higginbotham v. G. C. & S. F. Ry. Co., 155 S. W., 1025; Verble v. Schaff, 251 S. W., 1023; Southern Trac. Co. v. Rogan, 199 S. W., 1135; H. & T. C. Ry. Co. v. Finn, 109 S. W., 918; H. E. & W. T. Ry. Co. v. Kopinitsch, 268 S. W., 923; Hines v. Arrant, 225 S. W., 767; G. H. & S. A. Ry. Co. v. Wagner, 291 S. W., 664.

Appellant's specially requested issues Nos. 13 and 14 were properly refused because: (a) They assumed the existence of facts not established by the evidence; (b) The matters inquired about were submitted in the court's main charge; (c) If said issues had been submitted and answered favorably to appellants, such answers would not require a different judgment in the light of the jury's finding on the issue of discovered peril. North American Accident Ins. Co. v. Miller, 193 S. W., 751; Freeman v. G. H. & S. A. Ry. Co., 285 S. W., 607; K. C. M. & O. Ry. Co. v. Perry, 296 S. W., 683; Northern Texas Traction Company v. Woodall, 294 S. W., 873.

The main charge of the court includes no instructions except · explanations and definitions of legal terms, and the court did not err in overruling appellant's exceptions to the explanation given in connection with Special Issue No. 4.

The error, if any, is harmless and immaterial, since the jury found Special Issue No. 14 in appellant's favor, and the judgment in this case is predicated only on the jury's answers to the issue of discovered peril, which answers could not have been affected by the explanation or instruction given. Article 2189, Revised Stat-

utes of 1925; Northern Texas Traction Company v. Woodall, 294 S. W., 873; K. C. M. & O. v. Perry, 296 S. W., 683.

MR. PRESIDING JUDGE SHORT delivered the opinion of the Commission of Appeals, Section B.

The following certificate presenting three questions, has been filed with the Supreme Court by the Honorable Court of Civil Appeals of the Second Supreme Judicial District.

"This suit was instituted by appellee, Mrs. I. E. Cunningham, suing on her own behalf and as the natural guardian and next friend of her minor children, Ira and Freddie Cunningham, against the Missouri-Kansas-Texas Railroad Company of Texas, to recover damages for the death of the husband and father, I. E. Cunningham, resulting from being struck by an engine operated by appellant's employes at a public street crossing on East Broadway Street in the City of Forth Worth.

The special issues upon which the case was submitted to a jury fairly reflect all material issues of liability on which the plaintiffs relied for a recovery and all defensive pleas on which the defendant relied to defeat the action. The issues referred to, together with their answers, are as follows:

'1. Was the defendant negligent in operating the train at the rate of speed you may find the same was being operated, as it entered East Broadway at the time it struck the deceased?

Ans. No.

2. If you answered No. 1 "no," do not answer No. 2, but if you have answered it "yes," then answer: Was such negligence, if any, a proximate cause of the train striking the deceased?

Ans........

3. Did the operators of defendant's train keep such a lookout for crossings pedestrians as the train approached East Broadway, as a person of ordinary prudence would have done?

Ans. Yes.

4. Do not answer No. 4 unless you have answered 3 "no." Was such failure, if any you have found, a proximate cause of defendant's train striking deceased?

Ans........

5. Were defendants negligent in regard to the blowing of the train whistle as the train approached East Broadway? In this connection you are instructed that the statutes of this state require the blowing of the whistle at least eighty rods from the crossing and the failure so to do is negligence. Furthermore, the definition

of negligence, as above given, applies likewise, even if the whistle were blown at least eighty rods from the crossing.

Ans. No.

6. Unless you have answered No. 5 "yes," do not answer No. 6. Was such negligence, if any, the proximate cause of the defendant's train striking the deceased?

Ans........

7. The statutes of this state require the defendant to keep a bell on its locomotives and to ring the same at a distance of at least eighty rods from said crossing and keep such bell ringing until said locomotives shall have passed such crossing. Did defendant ring and keep ringing said bell as above defined, on its locomotive on the occasion that the train struck deceased?

Ans. Yes.

8. Do not answer No. 8 unless you have answered No. 7 "no." Was such failure, if any, a proximate cause of defendant's train striking deceased?

Ans........

9. On the occasion that defendant's train struck deceased, was there a flagman at said crossing then and there flagging traffic of the approach of said train?

Ans. Yes.

10. Do not answer No. 10 unless you have answered No. 9 "no." Was the absence of said flagman, if any, negligence, as that term is defined to you?

Ans........

11. Do not answer No. 11 unless you have answered No. 10 "yes." Was such negligence, if any, a proximate cause of defendant's train striking deceased?

Ans........

12. Do not answer No. 12 unless you have answered No. 9 "yes." Was such flagman negligent in regard to warning the deceased as he approached defendant's railroad track?

Ans. Yes.

13. Do not answer No. 13 unless you have answered No. 12 "yes." Was such negligence, if any, a proximate cause of defendant's train striking deceased?

Ans. No..

13-A. As soon as the engineer discovered the perilous situation of the deceased, did he use ordinary care to use all the means at his command, consistent with his own and his passengers' safety, to avoid striking the deceased?

Ans. No.

13-B. Unless you have answered 13-A "no," do not answer 13-B. Was such failure, if any, as inquired about in 13-A a proximate cause of the defendant's train striking deceased?

Ans. Yes.

In regard to such of the following questions as same may be applicable, if at all, you are instructed that if one has, by his negligence, caused another to be surrounded by such circumstances as to appear to that other to threaten the destruction of his life or serious injury, then that other is not to be held negligent merely by the fact that in an effort to save his life, he makes a choice of means from which injury results, notwithstanding it may turn out that if such other had done differently, or had done nothing, he would have escaped injury.

14. Did the deceased use ordinary care to look for approaching trains on the occasion of his approaching the track of defendant at the time he was killed?

Ans. No.

15. Unless you have answered No. 14 "no," do not answer No. 15. Was such failure, if any, a proximate cause or a proximately contributing cause of deceased being struck by defendant's train?

Ans. Yes.

16. As deceased approached the crossing of defendant's track on the night of his death, did he use ordinary care to listen for approaching trains?

Ans. No.

17. Unless you have answered No. 16 "no," do not answer No. 17. Was such failure, if any, a proximate cause or a proximately contributing cause of defendant's train striking deceased?

Ans. Yes.

18. Did the deceased use ordinary care to heed the warning of the flagman, if any?

Ans. No.

19. Did the deceased know as he approached the crossing of defendant's track that the train was approaching?

Ans. Yes.

20. Unless you have answered No. 19 "yes," do not answer No. 20. Was the deceased negligent in going on the track of the defendant in view of the fact that you have found in answer to No. 19, as you have?

Ans. Yes.

21. Was the killing of deceased an unavoidable accident?
Ans. No.' "

Upon the findings of the jury the court rendered a judgment for the plaintiffs, $2400 to Mrs. I. E. Cunningham, and $1200 each for her children, Ira and Freddie, a total of $4800. From the judgment so rendered the defendant duly prosecuted its appeal.

Preliminary to the consideration of the questions presented in this certificate, and for the purpose of giving an outline of the situation and environment attending the death of I. E. Cunningham, we will state that the evidence shows that appellant's line of railroad extended south out of the city of Fort Worth and crossed East Broadway street some distance south of its depot. Approximately twenty-four railroad tracks intersect East Broadway Street at this place, the distances between them varying from ten to twenty feet, appellant's track being the last one on the east. The injury occurred about 8:30 on the night of January 10, 1924. There was more or less fog in the atmosphere, and as appellant's train approached the crossing from the north the statutory warnings were given. There was a lighted street lamp immediately over the point of intersection between appellant's railroad line and the street, and a flagman was stationed at the crossing, though the jury found him to be negligent in regard to warning the deceased. The track just west of appellant's was approximately fifteen feet therefrom, and between that track and the adjoining one on the west there was a distance of thirty to fifty feet. A great number of the tracks described were used by various railroad companies as switch tracks, and in using many of them the switch engines worked north of the street crossing, and did not pass over it. A switch engine was working on one of the tracks adjacent to appellant's at the time deceased was killed.

The deceased and a companion approached from the west with the obvious purpose of going on down East Broadway Street. At some point not nearer than fifteen feet from the west rail of appellant's track, both deceased and his companion began to run. The other man, who was a little ahead of deceased as they reached the track, escaped injury, but deceased was struck and killed. There was nothing to obstruct the engineer's view down the track.

Appellant urges before this court numerous assignments of error, only three of which have given us any concern. In our original opinion, filed herein, we reversed and remanded the cause on the theory that the trial court committed reversible error in giving

the charge immediately preceding special issue No. 14, pretermitting, for reasons stated in our original opinion, a discussion or determination of questions 1 and 2 below. On motion for rehearing, duly filed, we were referred to certain evidence not theretofore specifically brought to our attention and are not now in entire accord, wherefore, in view of the importance of the questions raised, and of the disagreement among us, we deem it advisable to certify to your Honors the following questions:

1. Is there any evidence raising the issue of discovered peril?

2. Did the court err in refusing to submit the issue of whether the negligence of deceased was the sole cause of his death?

3. Did the court commit reversible error in giving the charge immediately preceding special issue No. 14, hereinbefore set out?

Under the first question, appellant submits that the issue of discovered peril is not raised by the evidence and cites the following cases: G. H. & S. A. Ry. Co. v. Price, 240 S. W., 525; G. H. & S. A. Ry. Co. v. Sloman, 244 S. W., 268; T. & N. O. Ry. Co. v. Wagner, 262 S. W., 902.

Appellees contend that the jury having a right to accept that portion of the testimony of defendant's witnesses which supports the findings, and discard portions thereof tending to relieve defendant's employes of neglect, the issue was adequately raised. The contention is made that there is evidence in the record from which the jury could properly find that appellant's engineer saw and realized the peril of the deceased at or about the time be blew the alarm whistle, and that if he had applied the brakes at or about that point the engine could have been stopped, or the speed thereof so materially diminished as to have prevented the accident. The following is the testimony which, if at all, supports the contention of appellees:

J. A. Ausley testified and has stated that he was an engineer of the Southern Pacific Railroad Company and at the time of the accident in question, was sitting seventy-five or one hundred feet west of the track on which the accident occurred, and on the north side of Broadway. He was facing in an easterly direction. He heard the whistle of the coming train for the crossing. It was about 3:30. "I saw some slim fellow, and I saw this fellow that got struck there * * * I saw a flagman around there, * * * near the middle of the street, * * * about fifteen or twenty feet from the Katy crossing. He was flagging the crossing, with a red lantern. * * * I saw this slim fellow mentioned, going east on Broadway.

They were both walking along, this gentlemen that got struck, and this other fellow, walking along; looked like they were close together, and as the train got near, this slim fellow broke and ran in front of the engine and looked like he just barely got across, and this other fellow tried to run around it, too, and he didn't make it. He looked like he was just about over the rail—near the rail; I don't think he was between the rails. I think he was on the outside of the rail. Of course, looking that way, I could not be positive."

In answer to further questions, he stated he heard whistling other than that already mentioned, "he whistled four short blasts of the whistle just before the engine went on the crossing—about the time the first fellow went over. The bell was ringing on that engine. The headlight was burning. It was misting rain; wasn't very much foggy, just a good misty rain, * * * after the man was struck, I walked over close by; didn't get very close to him; just saw he was hurt. * * * The train stopped, the back end of the first car stopped just about where he was lying. That was on the south side of Elizabeth street crossing—on Broadway. The engine and part of that first car was off the crossing but was real close to it. I just know the trucks were standing there. * * * That engine, I judge, is about sixty or sixty-five feet. * * * that first coach, those steel cars usually run about fifty feet, somewhere along there. I didn't pay any attention to what type of car it was."

Cross-examined, the witness testified, "I was sitting on the running board on the eastern side of an automobile."

He further testified that the second whistling heard by him was, "I guess fifteen or twenty feet from the crossing. When I first noticed the flagman, he was walking out toward the middle of the street. These men I saw were back near the flagman's shanty at that time, in front of it, I guess you would call it. I think they were behind the flagman. At that time, when he started walking out in the street, the train was down somewhere near the tower, down about where they whistled. These men were standing west of the Katy track, I judge about forty-five feet. I said this man that got struck, broke and ran around the engine just before it hit him. He ran. He didn't walk along at a moderate gait. He couldn't have been walking at a moderate gait as he approached the crossing. I judge he was about fifteen feet from the crossing when he started to run. He tried to get around the train and the train hit him. I am positive he ran from about fifteen feet. He

wasn't walking at a moderate rate of speed until he got up within a step or two of the crossing. It isn't true that he hesitated a step or two from the crossing and tried to get across. I am positive of that, that he was running. He was not running so very fast. He was stepping along pretty well for a man of his age. He looked to be about fifty years old. * * * I could not say how far that tower is from the north line of Broadway, * * * it looked to be about fifteen hundred feet. I am not positive about the distance. * * * This gentleman that got struck passed close by where I was sitting on this car. * * * As the train approached the crossing, I judge it was going about fifteen miles per hour. It was working steam. It was not picking up speed as it approached the crossing. I don't think it was picking up very much."

John Benedict, witness produced by the defendant, testified among other things that he remembered the occasion of a man being killed on what is now called East Broadway street, but formerly was called Elizabeth street, by a Katy train and that he, "was flagging the crossing that night. * * * The first information that I had that a train was approaching, I heard this whistle when it whistled for the crossing. I took my stand about five minutes before he got there, to flag the crossing for traffic. I took my stand about the center of the street, perhaps about ten or twelve feet from the Katy tracks where the train was approaching, * * * Cunningham (the deceased) came from the west, and I was on the side of the Katy main line from which he approached. * * * After I heard him coming, I got over to the north in order to stop him as he came by. That was after I knew he was coming. * * * I use a red lantern in connection with the flagging. * * * I kept wig-wagging the lantern backward and forward. * * * The pilot of the engine had got probably thirty or forty feet, I guess, from the crossing, and I heard footsteps and I looked behind and saw a man running. I hollered at him and flagged him and he just did get across the crossing, and I heard some more footsteps and I looked around and it was Mr. Cunningham, and I caught hold of his coat and tried to stop him and he checked up like he was going to stop, and then raised his head and went on. * * * Before the first man cleared, I knew about the second man being there. I first realized there was a second man there about the time he got almost even with me; at the time Mr. Cunningham, the second man, got almost even with me. That was the first I knew of him. When he got even with me, the first man had already crossed the tracks,

because he was possibly ten or twelve feet ahead of this other man when they passed me. This first man was trotting—more of a run; the second man the same way. Mr. Cunningham didn't much more than hit the first rail until the train hit him. There was a headlight on that engine. Going south on the Katy tracks, there is some grade. This train was working steam. I could hear it. * * * I judge it to be about between two hundred and fifty and three hundred yards, to the interlocker from Elizabeth street. I could hear an engine working steam down that far. That grade is that far. The Katy main line is straight from the interlocker until you pass East Broadway street. * * * I heard more whistling after I heard the train farther down. Just before he entered the crossing, he whistled, about three whistles. Those whistles were short keen whistles. My best judgment is he gave those just before he entered the crossing. The headlight on that engine was burning. There were no other lights around that crossing except the street light over crossing. There is a street light hanging there, an arc light; it was burning. You can see by it. * * * I am not working for the railroad now."

T. L. Reddell testified that he was sitting on the running board of the car (automobile) with the witness Ausley, and that he got up and started across east of the tracks for a cigarette, that the flagman was in the street flagging the crossing and that, "what first attracted my attention that there was somebody else going on there, there was a man passed me in a long run, * * * and he made it across and after he passed, another man—this other fellow —tried to go across too. The first one got across and the other one didn't. * * * The flagman was flagging the crossing, and it seemed like the flagman made a step toward him, to stop him, threw his lamp out toward him, when this old man passed him; there was a young man and an older man. The older man didn't get on the track. Seems like he hit right about the front end of the pilot of the engine. * * *

Q. How far was Mr. Cunningham, which is the older man you spoke of, from the Katy track when you first saw him?

A. He was about fifteen feet from it.

Q. Was he running at that time?

A. He had just started to running as the other fellow passed me; just about the time the other fellow passed me, he passed the older man, too.

Q. Just about the time you saw Cunningham about fifteen feet from the crossing, where about that time was the pilot of the engine relative to Broadway?

A. It had just at that time, as I remember—the pilot was just about starting on to the pavement and the train was coming and the man went angling across the street in order to beat it across. * * * I saw the train as it approached. I stopped there myself and waited until the train went by. * * * Just after the men started to run, the engine sounded four short blasts of the whistle, warning whistle, as the man ran across in front of the engine. In my best judgment that train was running between twelve and fifteen miles per hour. I might say eighteen miles per hour. When the engineer applied the brakes, the pilot was just reaching the edge of the pavement on the other side, just about where they hit the old fellow, edge of the pavement on the south side of the street. The engine, tender and half of the first baggage car cleared the crossing."

E. E. Williams, witness produced by the defendant, gives his name, states his business as railroad conductor for the Southern Pacific Lines, and that he remembers the occasion of Mr. Cunningham being killed; that he had been over to a restaurant to eat supper and came back and stopped at the watchman's shanty and that, "when this accident took place, I was standing about two paces southeast of this flagman's shanty. * * * I was facing a little southeast. * * * I first noticed the four short blasts of the whistle and the bell was ringing. When I noticed that, it was near the north side of this Elizabeth street. I saw Mr. Cunningham just about the time he was struck. * * * When I first saw Mr. Cunningham, he was on the south side of Elizabeth street going east. When I first saw him, I should judge he was about twelve or fourteen feet, something like that, from the track; about three or four paces, just near the track. I didn't see anyone else go across in front of him. * * * about twelve or fifteen feet, maybe twenty feet, from the crossing. He had a red lantern. He was waving it, flagging the street. * * * When I first saw Mr. Cunningham, he was trying to make the crossing; go ahead in front of the train. He was trotting; faster than a walk. He did not make the crossing. He got hit on the crossing, * * * about the first rail. * * * I noticed this man as he was about three or four steps from the crossing. At that time the pilot of the engine was thirty or forty feet from him, and he was about three or four steps from the track, trotting. * * *

Q. Now, you describe four short blasts of the whistle. Will you give us the position of the train when those four blasts were sounded?

A. The position of the engine was, approaching on the north side of Elizabeth street, probably ten or twelve feet from the crossing, maybe twenty feet, something near that. It must have been one hundred and fifty yards or one hundred yards, anyway, when he blew the crossing whistle."

A. L. Ford, witness produced by the defendant, after having testified that he was the engineer, and about the time he left the depot, and about his blowing the crossing whistle, testified that he saw the flagman as he came out to flag the crossing, and began to swing his light across the track at this time, "was probably one hundred and fifty or two hundred yards when I first saw him (the flagman) come out. * * * When I saw him come out, I did not see any other person at or near the track; I didn't see anyone at all, then. He was swinging his lantern in the usual way. He was standing nearly in the middle of the street, a few feet from the track, * * * probably ten or twelve feet from the track. * * * I saw him and I continued to approach the crossing. * * * well, when I got up nearly—in a few feet of the crossing, probably twenty or twenty-five feet of the crossing, I noticed two parties approaching from the west side of the track. They were behind the watchman when I first noticed them, and one of them broke and ran across in front of the engine, and I watched him until he went out of my sight, and then I saw that he, evidently from the distance he was in front of the engine—only a few feet—and the way he was running, that he would get across all right, unless he happened to trip and fall; and then I noticed this other party. He was walking up towards—coming up towards the track; and when he got in a few feet of the track, the watchman—when he passed this old watchman, the watchman tried to stop him, or made an effort. Of course, I could not tell whether he said anything to him or not, but from the efforts he made, he called him and he hesitated. Well, sir, the watchman, I don't suppose—when he passed him I thought he was going to get up there and the old watchman started after him and as well as I remember, he tried to get hold of him and tried to stop him or something, and he did hesitate like he was going to stop, and then he just deliberately steps up and at that time the engine was right on him, and we were only a few feet from the crossing when he came up there. I would say the watchman was ten or twelve feet from the west rail of the

track when I first saw those two parties coming up. Of course I would not say positive, but something like that, because he always would walk out there. My opinion is that the watchman was, at that time, ten or twelve feet from the track. * * *

Q. At that time how far were these two parties west of the watchman?

A. Well, when I first noticed them, they were not over probably fifteen or eighteen feet; they were back of him, coming up to the track, when I first noticed them.

Q. They were fifteen or eighteen feet west of the watchman?

A. No, west of the track, which made them six or eight feet away from him—back of him you see. * * * When they came up to him, it seems as though he stepped over like and tried to attract their attention or called to notify them or something, and one of them broke and run across the track. I could not say whether they were north or south of the watchman when I first saw the two parties approaching the track from the west. They were along close to him. He was in about the middle of the street, and as well as I remember, they were just a little south of him. The watchman was facing at first towards the track. I would not say whether he turned around or what he did, but I know when they got up to him, he stepped towards them, or something, or turned around; I could not say exactly what he did do. They came up from behind him. He made an effort to stop them, or attract their attention, or something like that. * * * After he made a step towards these parties, I don't know what became of him then, because I saw the old man was going to step in front of the engine and I made an effort to stop. It had got up to where I saw that the engine was going to strike him, and of course my attention was attracted to my part of it, to do what I could to keep from hitting the old man, if possible. By that time the engine had passed the watchman, and this other young fellow, or whoever this fellow was—I don't know whether he was a young man or not, but I understand he was some young fellow there, because he was evidently pretty spry, the way he ran; he got across all right, and at the time the old party stopped, hesitated, he didn't stop still; he just walked up like he was walking along. He just kind of stepped up and the pilot knocked him down. He never did get on the track. When I saw he was going to step up and let the engine hit him, I applied the air. He was nearly on the track when I put the brakes on. He could not have been over more than one or two steps at the time, because he never did get on the track. That was after he hesitated,

that I put on the brakes; when he hesitated I supposed he was going to stop, but when I saw he was going to go on, it was too late. Up to that time I had not put on any brakes; had no occasion to. When I did put on my brakes, and when he was perhaps a step from crossing the track, the west rail, I put the air in emergency. That is what you call big holeing it, shut the engine off, because I was working steam; cut the engine off and put the air in emergency. Up to that time my steam was working. * * * I was making a speed then between twelve and fifteen miles per hour. I had not slowed down any because I had no occasion to slow down. That was the top speed that I had made between the depot and the place of the accident. I blew the whistle for the crossing. * * * That was probably between twelve and fourteen hundred feet from the crossing, used the whistle at a sufficient length to attract the watchman's attention that we were approaching the crossing, and he would usually come out, be out there in sight before the time that I would complete the whistle and turn the whistle lever loose, and which he was this night. I saw him when I whistled for the crossing. When the engine got nearly to the crossing, I blew it. When I saw those fellows come on and that fellow started to run across the track, I used the whistle. I used four short whistles. This was what I called my alarm whistle. * * * When I applied my brakes, I applied all the braking power I had. My engine went about one hundred and thirty-five or one hundred and forty feet from that time until I stopped. * * * The pilot beam of my train hit him. * * * I was not putting any sand on the rails at the time because it is not necessary. The engine was not slipping and it all happened so quick I really didn't have time. The sand would not have gotten back because it didn't run back far enough. * * * He was probably six or eight feet from the west rail when he hesitated, as I have testified. He perhaps took two or more steps after he hesitated before he was struck; probably he would take two steps, but when I saw that he was starting on, had begun to take his first step, then was when I got busy to stop, because I then thought he was going to step in front, which he did; after he hesitated, and then took the first step, when I applied the brakes, because I saw that the watchman couldn't stop him, and that he was going to come on. The old man was walking as he approached the track there; he was not going probably over two or three miles per hour, ordinary gait. He was not running; that is, he was walking along at a moderate gait at first, and then he hesitated and then stepped up, and of course it was done so quick, I could not say how fast;

practically on him then. The window in my cab was open. I made what we could call a good stop down there that night. I was probably in fifteen or twenty feet of this old man when I saw him, because this fellow that ran across the track, I was watching him, and then when he got across, then I noticed the old man coming up. * * * As well as I remember, the two of them were there together when I first noticed them, about eighteen feet from the track. At that time we could not have been over forty or fifty feet, anyway, from the north line of Elizabeth street. My testimony is that it was about forty or fifty feet. I don't know whether the old man didn't quicken his pace any from that time on until the time he hesitated, or stopped. The young man attracted my attention. That was about the time the young man broke and ran. When he broke and ran he diverted my attention from everything but him. At that time I was nearly up to the crossing; say a few feet, fifteen or twenty feet. My testimony is that he was fifteen or twenty feet from the crossing when the man that ran across, broke and ran. * * * After he got across then I noticed the old man, and by that time the engine had gotten on to the crossing, because the engine was on the crossing, and the young fellow ran across, right about nearly the middle of the street and he just barely cleared the engine. By that time the old man had come up, and that was about the time he hesitated. * * * This happened on my side. My side is the right side."

F. Stitzel, witness produced by the defendant, testified that he was, at the time, fireman on the engine that struck the deceased and that he "did not see him before he was struck. The blowing of the whistle in short blasts first attracted my attention to the fact that there was about to be an accident or that there had been an acci-den. * * * I judge we were about a car length, the best I can remember, from the north line of Elizabeth street, when he blew that whistle in short succession, a passenger car I mean, about seventy feet. I don't remember how many blasts were blown, just blowing short blasts there, and that attracted my attention that something was near the track. That is the character of whistle you blow for an alarm. It is what we call our alarm whistle. At that time the engine was traveling somewhere in the neighborhood of fifteen miles an hour. When I heard the alarm whistle blow, I looked to see if it was approaching on my side, and I could not see anything, and about that time the man came from his side. I never did see the man that was struck until after the accident. I saw nobody except this man that came across the track. I saw him

on the east side of the track, coming from the west side, going east. The brakes were put on. In regard to when the whistle was blown with reference to the time that I saw that man crossing the track and going over on the east side,—the whistle was blown—I straightened up with my head out the window this way (indicating) and he got over. The brakes were put on after the whistle was blown. They were put on about, or just about the time I saw this man run across the track, just about the time he appeared on the east side. The pilot of the engine was somewhere about the middle of the street when the brakes were first applied. When the first blast of the alarm whistle was blown, I guess the pilot of the engine was in a car length of the crossing, something in the neighborhood of a passenger car. That we traveled approximately seventy feet plus half the width of that street after the alarm whistle was blown before the brakes were put on, is about as near as I can get it. After the brakes were put on, the engine went about a car length and an engine length, I judge one hundred and forty or one hundred and fifty feet. * * * I think we made a good stop in that distance. * * * Fifteen miles an hour was the highest speed we had made between the time we had left the station and the time we reached the crossing. We were picking up speed, and that was the fastest speed we had made. The train had not slowed down any until the brakes were put on in the middle of the street. * * * as that train approached that Elizabeth street crossing, I was sitting on the seat, sitting on the fireman's seat, with my hand on the firing valve, and with my head stuck out the window. * * * Our headlight has such power that you can see a man eight hundred feet for road service. We had that character of head light. I could see a man on the track eight hundred feet ahead of me that night. The track was practically straight, a little up grade."

The witness Swanner for the appellant, on cross-examination, testified as follows, with reference to the distance required to stop, and the position of the train after it was brought to a stop:

"When he stopped, the engine and the south end of the first baggage car—the engine got over and the south end of the head baggage car was just south of the street crossing. The baggage car, part of it was over the crossing; just a little, about four or five feet of it, or three or four feet. I don't know how long that engine and tender was; must be eighty or ninety feet long, may be one hundred feet."

With reference to the width of the street across which the appellant's engine traveled, the witness Spradling testified as follows:

"He was the width of the street away from me. I was on one side and he was on the other. *That street* is about *fifty feet wide,* I guess; I don't know exactly. I saw him cross the street fifty feet away."

Appellees cite in support of their contention the following cases: H. & T. C. Ry. Co. v. O'Donnell, 99 Texas, 636, 92 S. W., 409; Houston & T. C. R. Co. v. Finn, 101 Texas, 511, 109 S. W., 918; Hines v. Arrant, 225 S. W., 767; Verble v. Schaff, 251 S. W., 1023; H. E. & W. T. Ry. Co. v. Kopinitsch, 114 Texas, 367, 268 S. W., 923; G. H. & S. A. Ry. Co. v. Wagner, 291 S. W., 664.

With reference to the second question certified herein, appellants contend that the court erred in refusing to submit the following issue, which was duly requested by them.

"1. Was the deceased running at and before the time he reached the railroad crossing? Answer 'yes' or 'no.'

Answer:........

If you have answered the above and foregoing question in the affirmative, then answer the following question:

2. Did the deceased attempt to beat the train across the track? Answer:........

If you have answered the above foregoing question in the affirmative, then answer the following question:

3. Was the deceased guilty of negligence, if any, in attempting to beat the train, if he did?

Answer:........

If you have answered the above and foregoing question in the affirmative, then answer the following question:

4. Was such negligence, if any, the sole cause of the death of the deceased?

Ans.:........"

In this connection appellants cite the following cases, to-wit: M., K. T. Ry. Co. v. McGlamory, 89 Texas, 635, 35 S. W., 1058; Armour & Co. v. Morgan, 108 Texas, 417, 194 S. W., 942; Fox v. Dallas Hotel Co., 111 Texas, 467, 240 S. W., 517; C. & S. Ry. Co. v. Rowe, 238 S. W., 908.

Appellees contend that a defense based on the proposition that the negligence of the deceased was the sole proximate cause of his death is a separate and distinct affirmative defense not in any way relative to the defense of contributory negligence, and that the

burden of proving such defense was on defendant. It is urged that such a defense must have been specially pleaded and a proper issue requested in acceptable form. Appellees insist that defendant did not anywhere affirmatively plead that deceased's conduct was the sole proximate cause of his death, and that even if the facts upon which defendant now relies to justify the issue were pleaded, they were pleaded under the allegation of contributory negligence, whereby defendant sought to escape the consequences of its own negligence as a result of failure on the part of deceased to exercise ordinary care for his own safety.

Appellees further argue that the requested issue of sole proximate cause having been objectionable on account of being embodied with a number of other issues which were on the weight of the evidence, and otherwise vicious, and said issue being inseparable from the objectionable part, the court was not required to submit it.

Section 4 of appellant's specially requested issue, which presented the issue of sole proximate cause, was dependent on the answers to sections 1, 2 and 3 thereof. Appellees contend that section 1 submitted no issue, and simply sought to establish an evidentiary fact; that section 2 was on the weight of the evidence in that it assumed that deceased knew the train was coming, which fact was a controverted and submitted issue; that section 3 was likewise on the weight of the evidence. Appellees take the position that the question of deceased's negligence being the sole proximate cause of his death is, in fact, only a submission in an affirmative way of the matters presented in the court's issue of discovered peril; and that the same matter having been submitted in a way negative to appellant, previously, the onus was on appellant to request the specific affirmative submission of the defense properly, and at its own peril. Not having done so, that the burden was not on the court to prepare and submit a proper issue covering that defense.

Furthermore, it is insisted by appellees that the matter cannot be considered, because there was no assignment brought forward in the Court of Civil Appeals to the trial court's failing to prepare and submit a correct issue covering the matters sought to be submitted in the objectionable issue prepared and presented by defendant. The only exception and assignment of error made by defendant on this proposition is that the trial court erred in refusing to give in charge defendant's specially requested issue, as presented. Appellees contend that there is no assignment which would justify the appellate court in saying that the trial court should have prepared and sub-

mitted a proper issue on the point, since it is one thing to complain of the refusal to give a requested charge, and altogether another to complain that the court should have prepared and given a different one. Appellees cite under this question, the following cases: G. C. & S. F. Ry. Co. v. Shieder, 88 Texas, 152, 30 S. W., 902; Olds Motor Works v. Churchill, 175 S. W., 785; St. L. & S. W. Ry. Co. v. Bradbury, 237 S. W., 364; Wichita Falls R. & F. W. Ry. Co. v. Combs, 268 S. W., 447; Freeman v. G. H. & S. A. Ry. Co., 285 S. W., 607; Crawford v. El Paso Sash & Door Co., 288 S. W., 169.

The Court, submitting all the issues of negligence, gave the jury the following instruction, just ahead of the issues of contributory negligence:

"In regard to such of the following questions as may be applicable, if at all, you are instructed that if one has, by his negligence, caused another to be surrounded by such circumstances as to appear to that other to threaten the destruction of his life or serious injury, then that other is not to be held negligent merely by the fact that in an effort to save his life, he makes a choice of means from which injury results, notwithstanding it may turn out that if such other had done differently, or had done nothing, he would have escaped injury."

Appellant contends that the giving of this instruction constitutes reversible error, since it was a general instruction excepted to the giving of such instruction on the following terms:

"Moreover, the same is on the weight of the evidence in this case, and is calculated at least to have the jury believe that this defendant was negligent, and by its negligence caused the deceased in this case to be surrounded by circumstances such as appeared to him to threaten the destruction of his life."

Appellant cites the following authorities: Art. 2185, Rev. Statutes of 1925; M. K. & T. Ry. Co. v. Wolf, 40 Texas Civ. App., 381, 89 S. W., 778; T. C. Ry. Co. v. Waldie, 101 S. W., 517; Stooksbury v. Swann, 85 Texas, 563, 22 S. W., 963.

Appellees urge that the instruction is not general in character, since it does not instruct the jury how to answer the questions, under their findings of fact, and further that the instruction was necessary in the light of the pleadings and evidence, and the court's previous definition of ordinary care.

Mainly and principally, however, appellees rely on the fact that the judgment in this case was rendered on the findings of the jury in answer to the issues submitting the question of discovered peril;

and that even if the instruction was objectionable on the grounds set out in appellant's exception, nevertheless, since the jury found in favor of appellant, and against appellees on the main allegations of negligence, and contributory negligence, the verdict should not be disturbed being based as it is on the issues of discovered peril.

Appellees say that the instruction complained of had to do with the alleged negligent conduct of the defendant prior to the time deceased's peril was discovered and with the conduct of deceased after he was placed in a position of peril, whereas, the jury disregarded the allegation that defendant was guilty of negligence prior to the time deceased got in a position of peril, but found it was negligent only in regard to the duties imposed upon it after discovering the peril of deceased. There was evidence raising the issue of defendant's negligence on many of the theories pleaded. It is urged that no matter how improper and erroneous was the charge, it could not, and did not, affect the finding of the jury with reference to the issue of discovered peril, upon which the verdict is based. The instruction did not refer to the negligence alleged and found against defendant in regard to its conduct after deceased was placed in a position of peril upon which the judgment is based.

Appellees cite the following authorities in support of their contention under this question: Article 2189, Revised Stat. of Tex., 1925, Davis v. Pettitt, 258 S. W., 1046; Veazey v. Gal. H. & S. A. Ry. Co., 290 S. W., 283; Apex Company v. Grant, 276 S. W., 445; Houston L. & P. Co. v. Daily, 291 S. W., 317.

In view of the importance of the questions and a lack of entire agreement among us, we deem it advisable to certify these three questions to your Honorable Court.

Generally speaking the basis on which recovery, under the humanitarian rule in a crossing case is founded, is, that the party approaching the crossing either does not see the train, or unwisely attempts to cross in front of it, and that the train men know, or have reason to believe, that the party approaching the crossing will not stop or slow down to permit the train to pass, and with that knowledge or belief fail, after their discovery of the peril, to use proper care to avoid a collision. Under this rule the contributory negligence of the person injured is no defense, when it is shown the operatives of the train had discovered the peril of such person in time to have avoided the collision by the use of ordinary care, under the particular circumstances of the situation. Texas & Pacific Ry. Co. v. Breadow, 90 Texas, 30, 36 S. W., 410; Texas & Pacific Ry.

Co. v. Scaggs, 90 Texas, 460, 35 S. W., 295; Blytheville L. & A. S. Ry. Co. v. Gessell, 158 Ark. 569, 250 S. W., 881; Gregory v. Missouri Pacific Ry. Co., 168 Ark., 469, 270 S. W., 621; Logan v. Chicago B. & I. Ry. Co., 300 Mo., 611, 254 S. W., 705.

In order that the issue of discovered peril may be raised it is necessary to adduce evidence tending to show, first, that the deceased was in a position of peril, or would in reasonable probability enter a perilous situation; second, that he could not, or would not, in all probability, extricate himself from the dangerous situation; third, that after seeing the perilous situation of the deceased and realizing that he probably would not extricate himself therefrom, the operatives of the train fail to exercise ordinary care in the use of all the means at their command to avoid the collision; fourth, that, as a result of such failure, the deceased was injured. If the evidence embraced in the certificate, viewed in the most favorable light, substantially supports the material allegations on this subject, in the petition of the appellees then question No. 1 must be answered in the affirmative. We are of the opinion that the testimony quoted in the certificate on this subject, which includes that of the witnesses Ausley, Benedect, Redell, Williams, Ford, Stitzel, Swanner and Spradling, according to the rule above announced, is sufficient to raise the issue of discovered peril.

As related to the issue of discovered peril the testimony of the engineer in charge, considered in its entirety and upon the assumption that all of it is true, tends to show that the deceased approached from the east of the railroad track on which the train was located, while the train was at a considerable distance to the north of the point on the track where Cunningham was approaching, and that the manner of the approach to the railroad track by Cunningham indicated an intention not to cross it but to await the passage of the train. This testimony further indicated that when the engineer discovered that Cunningham had changed his apparent intention and began to attempt to cross in front of the train, it had approached the point where Cunningham was thus attempting to cross in front of it so near that its speed could not have been sufficiently checked by the use of the means under the control of the engineer to avoid the infliction of the injury upon Cunningham. However, a part of the testimony of the engineer and also a part of the testimony of the fireman and a part of other testimony, assuming this testimony to be true, indicated that, after Cunningham had passed across twenty-three railroad tracks and had only one other railroad track

to pass before he had reached a place of safety, as Cunningham apparently thought, he approached the track on which the train was, in fact, located, in a run, evidently indicating a purpose to cross the track in front of the train and that when the engineer discovered Cunningham thus running towards the railroad track with such apparent intention there elapsed a sufficient time, considering the relative position on the track of the train and of the point where Cunningham, in fact, actually crossed, for the engineer to have put on the brakes, and to have sounded the alarm whistle, either or both of which might have been sufficient to have enabled Cunningham to have crossed the railroad track in safety. This is especially true when other testimony indicates that at the time Cunningham was struck he was in the act of leaving the railroad track on the west, and that he only needed a moment or two to have enabled him to have cleared the track and avoided injury. Moreover, this testimony was sufficient to support the answer of the jury to question 21, and upon the whole indicated that the accident could have been avoided had the engineer, after discovering Cunningham's peril, put on the brakes and sounded an additional warning whistle, neither of which was done at that time. Galveston, H. & S. A. Ry. Co. v. Wagner, 298 S. W., 552; Houston E. & W. T. Ry. Co. v. Kopinitsch, 114 Texas, 367, 268 S. W., 923; Houston & T. C. Ry. Co. v. Finn, 101 Texas, 511, 109 S. W., 918; Gulf C. & S. F. Ry. Co. v. Lankford, 88 Texas, 499, 31 S. W., 355; Verble v. Schaff, 251 S. W., 1023; Higginbotham v. Gulf C. & S. F. Ry. Co., 155 S. W., 1025.

With reference to the second question, the certificate shows that the appellant contends the jury should have been permitted to have determined whether the negligence of the deceased was the sole cause of his death. The certificate further shows that the manner in which appellant sought to have this issue determined by the jury was by requesting *in solido* the court to submit four issues, the issue embraced in the fourth question being submitted with the other three and was to be answered only in the event the preceding question should be answered in the affirmative, and that preceding question was only to be answered in case the question preceding that had been answered in the affirmative, which preceding question was only to be answered in the event the first question should be answered by the jury in the affirmative. It will be noted that the evidentiary facts embraced in the first three issues of the requested charge were, in fact, ascertained by the jury in answering special issues Nos. 19

and 20 embraced in the main charge of the court. The appellant was under the duty to present to the trial judge, in proper form, a request for the submission of any issue desired. The failure of the court to give a more specific instruction upon a given issue, where it is requested to do in an improper form, does not constitute reversible error where the court has actually submitted the defense, though, in general terms. Freeman v. Galveston, H. & S. A. Ry. Co., 285 S. W., 607. If, under the evidence, the judgment rests upon the finding of the jury, as to the fact of discovered peril, it is not material to determine whether the deceased was guilty of negligence and whether that negligence was the sole proximate cause of the injury. Northern Texas Traction Co. v. Woodall, 294 S. W., 873. Considering the manner in which the requested issue was drawn and submitted, the court was under the duty to submit or to refuse the same as an entirety. The court had already covered the matter, improperly drawn, as presented in the special issue of its general charge and it was not required of the court to reform and correct the paper as presented and then thereafter to submit it. Art. 2186, Rev. Civ. St., 1925, Medford v. Kimmey, 298 S. W., 140; Freeman v. Galveston, H. & S. A. Ry. Co., 285 S. W., 607; Northern Texas Traction Co. v. Woodall, 294 S. W., 873. We, therefore, are of the opinion that the trial court did not err in refusing to submit the issue whether the negligence of the deceased was the sole cause of his death for the reasons stated.

We are further of the opinion that the trial court did not commit a reversible error in giving the charge, immediately preceding special issue No. 14, which charge is copied in the certificate. It will be noted from the certificate that the jury found the appellant to be not guilty of any of the acts of negligence pleaded by the appellees, except those acts necessary to constitute liability under the humanitarian rule. It will further be noted that the jury found that the deceased was guilty of contributory negligence which would have constituted the proximate cause of his death but for the findings in answer to issues Nos. 13 and 13-A. In other words, the question of negligence on the part of appellant, except as stated, and that of contributory negligence on the part of deceased were found in favor of the appellant. It will also be noted that the special instruction of which complaint was made refers specifically only to the questions following the insertion of the charge, and that it does not permit the jury to apply this instruction to any of the matters embraced in the questions preceding its insertion. These

questions, to which the special instruction applies, relate alone to the conduct of the deceased except the last one, which is question No. 21 wherein the jury says that the killing of the deceased was not an unavoidable accident. In fact the instruction deals with the negligence of the deceased and does not deal with the negligence of the appellant. It referred only to the contributory negligence of the deceased which the appellant had pleaded as a defense. It did not apply to the conduct of the engineer of the railroad train. Under the humanitarian rule the contributory negligence of the deceased is not a matter of material inquiry. The liability of the appellant must be determined from the viewpoint of the engineer as measured by the standpoint of a reasonably prudent person under the same or similar circumstances. The trial judge grouped all the issues relating to the negligence of the appellant in the first portion of the charge and then inserted the instruction of which complaint is made, thereafter, submitting the issues of contributory negligence only, except that relating to an unavoidable accident. Such being the situation it is not reasonable to conclude that the jury would have considered that instruction in connection with the negligence of the engineer of the train, which according to the findings of the jury, related only to conduct transpiring subsequent to his discovery of the perilous situation of the deceased. So whether the instruction was in the nature of a general charge and therefore inhibited by the statute, we are of the opinion that the giving of it could not have resulted in any injury to the appellant. Art. 2189, Rev. Stat., 1925; Northern Texas Traction Co. v. Woodall, supra; Kansas City M. & O. Ry. Co. v. Perry, 296 S. W., 683; Davis v. Pettitt, 258 S. W., 1046; Veazey v. Galveston, H. & S. A. Ry. Co., 290 S. W., 283; Houston L. & P. Co. v. Daily, 291 S. W., 317.

We therefore recommend that question No. 1 be answered in the affirmative, that question No. 2 be answered in the negative and that question No. 3 be answered in the negative.

The opinion of the Commission of Appeals answering the certified questions is adopted and ordered certified.

*C. M. Cureton,* Chief Justice.