### TEXAS & N. O. RY. CO. v. CROW et al.
#### No. 2736.

Court of Civil Appeals of Texas. Beaumont.

Jan. 30, 1937.

Rehearing Denied Feb. 3, 1937.

Duff & Cecil, of Beaumont, for appellant.

E. B. Pickett, Jr., of Liberty, for appellees.

O'QUINN, Justice.

This is the second appeal in this case. For proceedings on former appeal, see (Tex.

Civ.App.) 300 S.W. 93 and 121 Tex. 346, 48 S.W.(2d) 1106. The instant appeal is from a judgment in appellees' favor in the sum of $17,500.

On the night of March 19, 1924, C. C. Crow was struck and killed by a westbound passenger train of the Texas & New Orleans Railroad Company, at a public road crossing in the town of Nome. This suit was brought by his widow, Mattie B. Crow, for herself and as next friend of her two minor children, Carl C. Crow and Mildred I. Crow, to recover damages on account of Crow's death, they being joined in the suit by Clarence C. Crow, a minor when the suit was first brought, but who at the time of filing their amended petition in the instant proceeding had reached his majority.

The cause was tried to a jury upon special issues in answer to which they found: (a) That the whistle on the engine was not blown 80 rods from the crossing; (b) that the bell on the engine was not rung 80 rods from the crossing and was not continuously rung until the crossing was reached, and that each of these was a proximate cause of the collision and death of C. C. Crow; (c) that the train at the time it approached the crossing was running at a rapid and dangerous rate of speed, and that this was negligence and a proximate cause of the collision and death of C. C. Crow; (d) that deceased Crow was not guilty of negligence in going upon the track in the manner in which he did; (e) that the fireman on the train discovered Crow and realized that he was in a perilous and dangerous situation soon enough, acting alone, or with the engineer on said train, by the use of all reasonable means within their power, to have warned said Crow of the approach of the train in time to have prevented injuring him; (f) that the fireman on the train after discovering Crow and realizing that he was in a perilous and dangerous situation, failed to exercise ordinary care and failed to use all reasonable means within his power to warn Crow of the approaching train; (f) that the fireman on said train discovered and realized that Crow was in a dangerous and perilous situation soon enough to have informed the engineer on the train of Crow's situation so that the engineer by the use of all reasonable means in his power, consistent with the safety of his train, could have prevented injuring and killing Crow; and (g) awarded plaintiffs damages in the sum of $17,500, apportioned, Mattie B. Crow, $11,500; and to each of the children $2,000. By agreement of the parties the damage to the automobile in which deceased Crow was riding at the time of the collision was $350. Judgment was entered in accordance with the jury's verdict. Motion for a new trial was overruled, and we have the case for review.

Appellant's brief contains twenty-six propositions based upon twenty assignments of error, the propositions being presented grouped into seven heads. We shall discuss only the last three, as it is thought they will dispose of the case.

■ We overrule the assignments urging error in the court's refusing an instructed verdict for appellant. Under the record, such instruction would have been without support, and hence error.

■ The assignments that appellant should have had judgment because deceased was guilty of contributory negligence as a matter of law are overruled. This issue was submitted to the jury and they acquitted deceased of negligence. This finding is supported by the evidence. Trochta v. Missouri, K. & T. Ry. Co. (Tex.Com.App.) 218 S.W. 1038; Texas & N. O. Ry. Co. v. Crow, 121 Tex. 346, 48 S.W.(2d) 1106 (this cause on former appeal).

■ Propositions 19 to 24, inclusive, complain that the court erred in failing to submit to the jury the issue of unavoidable accident, though requested to do so. We overrule this contention. An unavoidable accident is one not caused by the negligence of either party. Here the evidence did not raise the issue, but pointed to negligence, and the jury acquitted the deceased of contributory negligence, and convicted appellant of negligence which was the proximate cause of deceased's injury and death. Dallas Ry. & Terminal Co. v. Darden (Tex. Com.App.) 38 S.W.(2d) 777. Furthermore, on the trial appellant merely objected to the court's charge because it did not submit an issue of unavoidable accident, the objection being:

"The testimony raising the issue as to whether or not the injuries resulting in the death of C. C. Crow were the result of an unavoidable accident, the defendant asks that the court submit to the jury, under appropriate instructions, the meaning of the term 'unavoidable accident' and an issue as to whether the injury here was the result of same".

Appellant did not prepare an issue submitting the question of unavoidable accident, and request its submission. The objection

to the charge that it did not contain such issue, and a mere request to the court that it prepare and submit such an issue, was not sufficient, and the failure of the court to do so was not error. To entitle appellant to urge the objection sought, it must have prepared a special charge submitting the question to the jury, and tendered same to the court for submission. The mere objection to the charge because it omitted such issue and a request that the court prepare and submit such issue, was not sufficient to bring the matter up for review. Gulf, C. & S. F. Ry. Co. v. Conley, 113 Tex. 472, 260 S.W. 561, 32 A.L.R. 1183; Palmer v. Guaranty State Bank (Tex.Civ.App.) 292 S.W. 953; Pennington Produce Co. v. Browning (Tex.Civ.App.) 293 S.W. 935, affirmed (Tex.Com.App.) 299 S.W. 870; Archibald v. Bruck (Tex.Civ.App.) 264 S.W. 500; Harris v. Thornton's Dept. Store (Tex. Civ.App.) 94 S.W.(2d) 849, 852. Same case by Supreme Court on application for mandamus, Harris v. Leslie, 96 S.W.(2d) 276.

In Gulf, C. & S. F. Ry. Co. v. Conley, 113 Tex. 472, 260 S.W. 561, 32 A.L.R. 1183, Chief Justice Cureton, construing articles 1971 (now 2185) and 1985 (now 2190), said:

"These two statutes were enacted to accomplish the same purpose, and we think a failure to submit any particular issue under either statute can be reviewed on appeal *only where the record shows a special charge was tendered on that issue.* [Italics ours.]

*"But in the instance of a defective or erroneous charge on a subject or issue which the court has undertaken to charge upon, the objections required by article 1971 [2185] take the place of special charges and render it unnecessary that the latter be tendered.* It is immaterial whether the matter objected to in the court's charge is a mere defective or incomplete statement of the law or issue to be determined, or is affirmatively erroneous; objections which sufficiently specify the error will preserve the point on appeal, without the necessity of again directing the court's attention to the same subject by special charge." (Italics ours.)

The other cases cited are in line with and follow this holding in the Conley Case. While there is a conflict in the decisions, this holding is still the rule. In Harris v. Thornton's Dept. Store (Tex.Civ.App.) 94 S.W. (2d) 849, at page 857 et seq., Judge Funderburk, in discussing the question, cites Gulf, C. & S. F. Ry. Co. v. Conley, and follows its holding. Dissatisfied with this holding, the appellant in this Harris Case applied to the Supreme Court for a writ of mandamus to compel the Eastland Court of Civil Appeals to certify to the Supreme Court the following question:

"Where the case was submitted to the jury on special issues, and the Appellant, plaintiff in the Court below, timely and properly objected in writing to the Court's charge because of the Court's failure to submit to the jury a material issue, necessary to his recovery of damages and on which there was a conflict of evidence, which objections were overruled by the Trial Court, to which action and ruling of the Court plaintiff excepted; but did not formulate an issue presenting the question and request the Court to submit such issue to the jury; was his objection and exception made as aforesaid sufficient to entitle him to a review by the Appellate Court of the alleged error of the Trial Court in failing to submit said issue?"

In denying the relator leave to file his application, the Supreme Court said:

"The opinion of the Court of Civil Appeals freely admits the conflict of decisions on the question, but follows the opinion of this court in Gulf, C. & S. F. Ry. Co. v. Conley, 113 Tex. 472, 260 S.W. 561, 32 A. L.R. 1183. This court, as recently stated in Ætna Life Ins. Co. v. Gallagher, 94 S.W. (2d) 410, will not require the certification of a question which it has already decided, unless the decision of the Court of Civil Appeals on that question is contrary to the Supreme Court's decision thereon. The decision of the Court of Civil Appeals being in harmony with the decision of this court in the Conley Case, supra, the motion for leave to file will be denied." See Harris v. Leslie, Chief Justice, et al. (Tex.Sup.) 96 S.W.(2d) 276.

It is thus seen that the holding in the Conley Case is still the rule on this question. Further, that the Supreme Court adheres to the rule announced in the Conley Case, is shown by its granting a writ of error in Peckham v. Johnson (Tex.Civ.App.) 98 S. W.(2d) 408. There the Fort Worth Court of Civil Appeals held with appellant's contention here, but on application for writ of error against this holding, the writ was granted on an assignment of error based directly against that holding. This, we think, indicates with certainty that the Conley Case will again be announced as controlling.

Propositions 14 to 18, inclusive, complain of the manner in which the question of discovered peril was submitted to the jury.

On this question, the following issues were submitted:

"Question No. 10. Did the fireman upon the train in question discover and realize that said C. C. Crow was in a perilous and dangerous situation, soon enough for said fireman, acting alone, or for the said fireman and engineer upon said train, acting together, by the use of all reasonable means within their power, to have warned said C. C. Crow of the approach of said train in time to have prevented injuring and killing said C. C. Crow? Answer 'yes' or 'no'."

"The jury answered 'Yes.'"

"If you answer 'yes' to said Question No. 10, then answer this question:

"Question No. 11. After the fireman upon the train in question discovered and realized that said C. C. Crow was in a perilous and dangerous situation, did the said fireman and engineer upon said train or did either of them fail to exercise ordinary care to use all the reasonable means within their power to warn said C. C. Crow of the approach of said train in time to prevent the injuring or killing of said C. C. Crow?

"Answer 'yes' or 'no'."

"The jury answered 'Yes.'"

"Question No. 12. Did the fireman upon the train in question discover and realize that said C. C. Crow was in a perilous and dangerous situation soon enough to have informed the engineer of said train that such was said Crow's situation, so that the engineer, by the use of all reasonable means within his power, consistent with the safety of said train and the crew and passengers thereon, could have prevented the injuring and killing of said C. C. Crow?

"Answer 'yes' or 'no'."

"The jury answered 'Yes.'"

The propositions are presented grouped under the heading "Erroneous Submission of the Issue of Discovered Peril." The gist of the propositions are: (a) That special issues Nos. 10 and 11 (set out supra) not only assume that the duty of appellant to warn deceased of the approaching train existed, but also invaded the province of the jury by further assuming that the warning, if given, would have been effective; (b) that the court in submitting special issues Nos. 10 and 11 so worded them as to invade the fact-finding province of the jury and predetermine that the duty to warn deceased existed and that same would have been effective, and that a man of ordinary prudence, under the circumstances surrounding those operating the train, would have been guilty of negligence in putting on the brake of the train instead of sounding an alarm; (c) that the engineer having testified that because of his position in the engine cab it was impossible for him to see deceased as he approached the track and that as soon as the fireman advised him of the approach of deceased that he put on the brake in emergency and that in so doing he exercised his best judgment, it then became a question of fact for the jury as to whether the engineer was guilty of negligence in putting on the brake, instead of blowing the whistle, and the court had no right to assume and instruct the jury, as was done in special issues 10 and 11, that those operating the train should have warned deceased instead of attempting to stop the train; (d) that as a necessary element of discovered peril, the operators of the train must not only have seen and realized deceased's perilous position at a time when, by the exercise of care, they could have avoided injuring him, but that the conditions must have been such that they realized that he would probably remain in his perilous position, and the court omitting this necessary element from special issues 10, 11, and 12, wherein it submitted the issue of discovered peril, erred to the prejudice of appellant and invaded the province of the jury in determining said fact without a finding of the jury on same; and (e) that the finding by the jury that "those operating the train in question saw and realized that C. C. Crow was in a perilous and dangerous situation in time, by the use of ordinary care, to have warned C. C. Crow and by the use of the means at hand, consistent with the safety of the train, to have prevented injuring and killing Crow, is not a sufficient finding by the jury upon which to base a judgment, in the absence of a finding that at the time of the discovery of the perilous and dangerous situation of Crow there was a realization that the said Crow would probably remain in the dangerous position."

As the propositions are presented grouped, we shall so discuss them. Special issues 10 and 11 are not subject to the criticisms offered against them. They do not assume the matters urged against them. The objection to issues 10 and 11 is not that they assume that deceased was in a perilous and dangerous situation when he was discovered by the fireman, or at any time after he was discovered by the fireman up to the time of the collision, but that the charge assumed that it was the duty of appellant to warn deceased of the approaching train and that

if such warning had been given it would have prevented the injury and death of deceased. The undisputed evidence shows that the fireman saw deceased as he turned from the highway toward the railway crossing, some 80 feet away, and as he kept slowly driving his car toward the track crossing at a time when the train was some 300 to 500 feet from the crossing, and running very fast—between 50 and 60 miles per hour—and these issues simply submitted a particular theory of discovered peril raised by the pleadings and the evidence. Neither did they invade the province of the jury to find the facts inquired by the issues, nor were they on the weight of the evidence, nor did they indicate in any manner the opinion of the court as to the evidence or of its weight. The evidence raised the issue as to whether or not the fireman discovered deceased and realized that he was in a position of peril, at a time soon enough for him to have been given warning by blasts of the whistle in time for him to have stopped his car before reaching the crossing, therefore, the question of whether or not such warning was given, was an issue for the jury, separate and apart from any issue on the question of whether or not the collision might have been avoided by stopping the train or by reducing its speed. By the form of these charges, the court pre-determined nothing, but left it entirely to the jury for them to determine whether or not the acts inquired about had or had not occurred.

In Houston E. & W. T. Ry. Co. v. Kopinitsch (Tex.Civ.App.) 282 S.W. 884, a similar case on the facts involving the same question, special issues in the same form as here given were held to be correct. Two of the issues submitted were:

"No. 3. Did the fireman upon such engine discover and realize the perilous and danger-ous situation, if any, of the occupants of said automobile, in such time that he could, in the exercise of ordinary care, have given warning to the engineer, so that the engineer in the exercise of the same degree of care, by the sounding of the whistle given warning of the approach of the train in time so as to have avoided killing the deceased? Answer 'yes' or 'no' as you find the facts to be."

"No. 4. Did the fireman actually discover the perilous position of the occupants of the automobile in time, by the exercise of ordinary care, to have notified the engineer, so that the engineer, by the exercise of ordinary care with all the means at his command, consistent with the safety of the train and its passengers, could have stopped the train in time to prevent the injury?

"Answer 'yes' or 'no' as you find the facts to be."

Similar objections to the charge were there made as here, but were held not well taken. Application for writ of error was dismissed.

In St. Louis Southwestern Ry. Co. v. Inman (Tex.Civ.App.) 293 S.W. 650, 651, the same form of issue was submitted as to whether the fireman discovered the automobile in which the injured party was riding in time to have informed the engineer so that the engineer, in the exercise of ordinary care, could, by the use of the means at hand consistent with the safety of the train, have avoided the collision. This charge was objected to, but was held proper, and writ of error was refused.

■ Appellant insists that special issue No. 12 (set out supra) was defective and erroneous in that it did not include "the necessary element of discovered peril, the realization by the fireman not only that Crow was in a perilous and dangerous situation, but that he would likely remain in same." In Pecos & N. T. Ry. Co. v. Rosenbloom (Tex.Civ.App.) 141 S.W. 175, 184, the contention here urged by appellant was there urged, but the court held against it. This was affirmed by the Supreme Court, 107 Tex. 291, 173 S.W. 215, 177 S.W. 952. We have examined the cases cited by appellant in support of this contention, but do not believe they are authority for the proposition. In Baker v. Shafter (Tex.Com.App.) 231 S.W. 349, 350, it is said:

"The doctrine of discovered peril involves three elements, viz: (1) The exposed condition brought about by the negligence of the plaintiff; (2) the actual discovery by defendant's agents of his perilous situation in time to have avoided—by the use of all the means at their command, commensurate with their own safety—injury to him; and (3) the failure thereafter to use such means."

It is seen the additional element urged by appellant as necessary to constitute "discovered peril" is not included. This holding announcing the necessary elements to constitute discovered peril is but stating the well-settled rule, and we have not been able to find where it has been criticized or varied.

In appellant's brief, it says:

"We respectfully submit that there is not the testimony of a single, solitary witness,

taken alone or in connection with the testimony of others, that raises the issue of discovered peril or that even remotely justifies the jury's finding on the issue as submitted."

We think the evidence clearly raised the issue of discovered peril. Deceased Crow was killed by a westbound passenger train of appellant at a public road crossing in the town of Nome on the night of March 19, 1924. Appellant's line of railway ran from Beaumont west to Nome. The public highway also ran west from Beaumont to Nome and points beyond. For some two miles before reaching Nome, the highway ran parallel with the railroad, and within about 90 feet of the track. This highway was the main and much traveled route from Beaumont to the towns of Sour Lake, Saratoga, Batson, and their vicinity generally, and the crossing at which the accident happened was the only one in that immediate locality. Travel from Devers to Sour Lake also used this crossing. It was a very much used crossing, both by day and night. At Nome the highway just before reaching the crossing suddenly curved and approached the track at right angles, leading across north. That night the weather was bad, it having rained that evening, was chilly, cloudy, and a strong wind blowing. The train that killed deceased was a fast passenger train that was not scheduled to stop at Nome and was running late. It was coming from the east bound west, and deceased was driving along the highway in a closed Ford coupé, at the time going directly north across the track. No. 8, another fast passenger train, coming from the west going east, and No. 7, the train that killed deceased, passed at Nome; No. 8 taking the sidetrack on the south of the main line next to and parallel with the highway. No. 8 was slowly moving out as No. 7 approached the crossing. Nome was a nonstop station as related to these trains. The last stop of the train before the accident was in Beaumont. The distance from Beaumont to Nome was 21 miles. The train was to leave Beaumont at 7:59, but left at 8:06, seven minutes late, and arrived at Nome at 8:31, running the 21 miles in twenty-five minutes—an average of slightly more than 50 miles per hour.

The fireman on No. 7 testified that he first saw the automobile in which deceased was riding when it turned off of the highway and started north for the crossing some 80 feet from the crossing, and at that time the train was between 300 and 500 feet from the crossing. (On the first trial he testi-fied it was 500 feet.) That the train was running about 35 miles an hour and deceased was going about 10 miles an hour or less. That when deceased was within about 10 or 15 feet of the crossing he saw that deceased was not going to stop, and he hollered to the engineer to "hold her." That at the time he told the engineer to "hold her," the train was about 45 or 50 feet from the crossing (on the first trial he testified that the train was about 75 feet from the crossing, and deceased about 20 feet from the crossing when he realized that the automobile was not going to stop, and he told the engineer to "hold her," and the engineer instantly put on the brakes). In both trials, the fireman testified that he saw the automobile all the time after it turned off of the highway and was approaching the crossing, but that he thought deceased was going to stop, was the reason he did not sooner tell the engineer of deceased's presence. The engineer did not and could not see deceased because he was on the right side of the cab, and deceased was approaching from the left, but was clearly visible to the fireman. Another of appellant's employees, Richardson, the depot agent, testified that Crow was traveling about 8 miles an hour. It was in evidence that an automobile going at the rate of 10 miles an hour could be stopped within 10 feet or less. That if it was traveling 8 miles an hour it could be stopped within 4 to 6 feet. There was considerable conflict as to whether the whistle was blown after blowing for the crossing at some 1,200 to 1,500 feet east of the crossing. The engineer and fireman testified that the whistle was blown at the required distance from the crossing and also at intervals until within some 50 to 60 feet of the crossing. (On the first trial the engineer testified: "There were no other signals given after the road crossing signal. The road crossing signal was the last one.") Other witnesses testified that it was blown at several points. Others that it was not, or, if so, was not heard by them. Richardson, the depot agent, testified that train No. 7 did not always blow at the required point, 1,320 feet east from the crossing, and that that was not where it blew that night, he said: "I believe he was closer," and when asked how much closer, answered: "I don't know; he wasn't very far from the crossing," but further stated that "it sounded like" the train was about 700 or 800 feet from the crossing when the whistle sounded. He further testified that he saw the automobile when it turned off the highway toward the crossing.

That it was traveling very slow—about 8 miles an hour and continued going at that rate. That when it was about half way between the highway and the crossing (about 40 feet from the crossing) it appeared to him that there was going to be a collision and further said that when he saw the Crow car "about midway between the highway and the railroad crossing and when it appeared to him there was going to be a collision," he did not hear any whistle blown on that train. Johnson, a negro who was driving a truck for Crow, and who stopped where the highway turned to cross the track, testified that he heard the whistle when it blew back up the track for the crossing, but did not hear it blow after that. The jury found that the whistle was not blown as required for the crossing. The fireman testified that "when the fireman can see what is happening up near the crossing, and the engineer can't, the engineer has to depend on the fireman then." And "that it is the fireman's duty to keep a watchout all the time to be able to tell him." He further testified that when the train was from 300 feet to 500 feet from the crossing, he saw Crow turn off the highway and slowly drive toward the crossing—watched him drive to within about 15 feet of the crossing, when he was convinced that Crow was not going to stop, and he then told the engineer to "hold her"; that he thought Crow was going to stop—just rested on the assumption that he was going to stop—but he saw that Crow was getting nearer to the track all the time.

The issue of discovered peril was raised by the evidence, and the jury found against appellant on that issue, and we think the finding has sufficient support in the record. In Higginbotham v. Gulf, C. & S. F. Ry. Co. (Tex.Civ.App.) 155 S.W. 1025, 1027, it was said:

"If the circumstances reasonably indicated to said operatives the probability of his not getting off the track, they were not authorized to speculate on whether he would or would not get off, and take the risk of killing him when it was in their power to prevent injuring him.

"If the doctrine of discovered peril only applied when the operatives of a train were certain that the person injured was in peril of life and took no steps to save him when his injury could have been prevented, the necessary proof in every case in which discovered peril is the ground of recovery would show a case of murder or criminal negligence. Such proof is not necessary. International & G. N. Ry. Co. v. Munn, 46 Tex.Civ.App. 276, 102 S.W. 442. In the case cited this court, speaking through former Chief Justice Gill, says: 'There are loose expressions in cases from courts of the highest authority which tend to support the contention that, in order to justify a recovery in such a case, the engineer must *actually know* that deceased will not leave the track.' [Italics ours.] * * *

" 'The authorities, when rightly construed, are one on the proposition that, in order to give rise to this new duty resting upon the discovery of peril, it is not requisite that the engineer must know that disaster is inevitable unless he himself can avert it. It is enough if he knows that the person injured was in a place of danger from which he probably could not or would not extricate himself in time.' "

In Houston & T. C. R. Co. v. Finn, 101 Tex. 511, 109 S.W. 918, it was said:

"The case was submitted to the jury solely upon the ground of discovered peril, and, the jury having found that the servants of the company discovered that the plaintiff was in a perilous position, or about to enter into such position, in time to have avoided the injury by the means at their command, we cannot reverse the judgment if there be any evidence to justify the verdict. Being now of the opinion that there was some evidence to justify the jury in finding that the servants of the company discovered that the plaintiff was about to go into a place where he would be in danger of being struck by the cars in time to have avoided the injury by the means within their power, we deem it a profitless task to discuss the question. The Court of Civil Appeals have in their opinion pointed out, and as we think successfully, the testimony which authorized the jury's finding, and we are content to refer to it in confirmation of our conclusion."

The Supreme Court, speaking as above, affirmed the judgment of the Texarkana Court of Civil Appeals, in which that court said:

"In determining whether or not there was sufficient testimony in this case to authorize the jury to find that the appellant's employees could have prevented appellee's injuries after discovering his peril, we are not restricted to the issue as to whether or not the car could have been stopped before striking him. Stopping the car, if it could have been done under the circumstances stated by the court, was only one of the duties that devolved upon appellant's employees to avoid injury to the appellee, if they discovered

that he was in a perilous situation, or was going into one. * * * The duty to avoid injury to one in a position of peril is based upon principles of humanity, and has for its object the protection of life and body from injury. * * * In this case the appellant's employees, if they could not stop the car, might have so reduced its speed as to make its contact with the appellee, considering the rate at which he himself was traveling, harmless; or the employees might have given him warning of the approach of their car, and advised him of its proximity, so that he, by his own movements, might have avoided a collision." 107 S.W. 94, 100.

In Galveston, H. & S. A. Ry. Co. v. Wagner, 291 S.W. 664, 665, the San Antonio Court of Civil Appeals, in affirming a judgment for the killing of Miss Nora Wagner, said:

"There is no evidence that the engineer of the train saw deceased in time to have averted the accident, but the fireman testified, among other things: 'I was on the north side of the engine as the train was going east, and I saw this young lady that was injured, and from which injury she died. When I first saw her she was about 30 feet out in the road, 30 feet from the track. She had nothing that I observed. I saw nothing in her hands. She was running toward the depot. The train was approaching in the direction of the depot. She was running toward the depot up the road; that is, straight across the street there, running across the street there. She got up to the track next to the main line, what they call the storage track. That is on the north side. She ran up there, and stopped and hesitated. She came to a stop a couple of seconds. The train was still running when she stopped. At that time an application of air had been made, two of them had been made, and she stopped and hesitated, and, as the train was slowing down, making the third application, she ran down the track, looked like to me between ten or twelve feet, and darted across. I had no idea that she was going to try to cross the track, not until she ran and jumped. She stopped; I think she was stopped; she started again."

The court in discussing the happening, said:

"Though warned by bystanders not to attempt it, she ran into the very jaws of death. The engineer did not see her in time, and was in no position to see her, as we understand the evidence, and used no means at hand, until too late, to save her life. But *was that so with the fireman, who was in his place of duty, and plainly saw the woman.* Should he not timely have called the attention of the engineer to her, and might he not have slowed down his train the least bit which would have saved her life? This case is carrying the doctrine of discovered peril to the very limit. The writer thought so in the Schaff-Verble Case [(Tex.Civ. App.) 240 S.W. 597], supra, but the Commission of Appeals [251 S.W. 1023] did not, as above shown, and the Supreme Court approved their holding. * * * *Any ordinarily prudent person in the position of the fireman should have foreseen that it was the purpose of the deceased to attempt the crossing, and any ordinarily prudent person would have used all the means at hand to stop the train, reduce its speed, or give warning to the deceased of her danger.*" (Italics ours.)

Writ of error was granted in the Wagner Case. In affirming the judgment the Supreme Court said:

"We shall assume for the purposes of the case that Miss Wagner was guilty of contributory negligence, as a matter of law, and shall direct our attention exclusively to the issue of discovered peril.

"In order for a person to be in peril, it is not necessary that bodily injury will certainly be suffered by him. He is in peril whenever he is pursuing a course which probably will terminate in serious bodily injury to him. Whenever it reasonably appears to a second person, from facts and circumstances within his knowledge, that a person is pursuing such a course and probably will pursue it to the end, then, in such event, *the second person is held to have knowledge of the peril of the other.* This doctrine, we think, is clearly deducible from the many decisions on the subject of discovered peril, among which are the following." (citing decisions.) 298 S.W. 552, 553. (Italics ours.)

Here, when the fireman, when the train was some 500 feet from the crossing, and after the whistle had been blown for the crossing, saw deceased turn off of the main highway, some 80 feet from the crossing and start slowly driving his car directly for the crossing, and continued at the slow speed of about 8 miles per hour to drive on toward the crossing under the circumstances—the car windows up, the night dark, the train approaching from the rear, the high rate of speed of the train—50 or more miles per hour—the passing fast trains, no stop station, and deceased not appearing to have

heard the whistle blown for the crossing from his rear, and apparently ignorant of the approach of the train, as indicated by his continued slow approach to the crossing —should have foreseen that it was the purpose of deceased to drive over the crossing, and should have timely advised the engineer so that he could by sounding the whistle have warned deceased and thus avoided his injury and death. If the fireman who saw deceased all the time after he turned from the highway to the crossing had imparted this information to the engineer when the train was from 300 to 500 feet from the crossing, and the whistle had then been sounded, deceased could have stopped his car within 6 to 10 feet, according to the evidence, and thus have saved himself.

A case very similar to the instant case on the facts is Houston E. & W. T. Ry. Co. v. Kopinitsch, 114 Tex. 367, 268 S.W. 923, 924. It was decided by the Commission of Appeals, on certified question as to whether the evidence raised the issue of discovered peril. The fireman testified that the train had stopped at Mount Houston about 1 mile from the crossing where the killing occurred, and that from said station to the crossing there was no obstructions on the right of way to prevent any one from seeing it, and that the track was practically level. He further testified:

"I first observed this automobile the morning of the accident when we were just about one-fourth of a mile from the crossing, something like 1,000 feet. The automobile at that time was standing a little bit east of the crossing; he was in the act of turning the car around, it looked to me like; I saw him cut the wheels around towards the track and pull up towards the track·at a very slow speed. At that time he was something like 60 feet from the crossing, I should judge, and we were about 1,000 feet, or one-fourth of a mile, from the crossing at that time.· The train was running about 40 miles an hour. * * * He continued on toward the crossing, and I watched him all the time as he continued on towards the crossing. I did not tell Mr. Reynolds that I saw him, did not call his attention to the fact that I saw him. [Reynolds was the engineer.] * * * When the driver of the car got upon the track he tried to speed across. I mean by that that he speeded up the car just as he got on the track, after he got the front wheels on the track. I mean that you could see the car give a little increase in its rate of speed. But from the time I first saw him 60 feet from the track,

when I think he was standing still, until he got the front wheels on the crossing there was no change in his speed; he was running slowly and going directly towards the track. When I first saw him I was about one-fourth of a mile from the crossing, about 1,000 feet, about that, and I did not notice any effort of his to stop after I first saw him start towards the crossing. I could see him going towards the crossing, but I thought· he was going to stop; I thought he was going to pull up beside the track and stop, and that is the reason I didn't say anything to Mr. Reynolds. * * * Mr. Reynolds did not see him; it was on my side. I did not tell him that a car was approaching the crossing. I knew it was a road crossing and blowed for it. * * * From the time I first saw the automobile until he got the front wheels on the track, it was running about 3 or 4 miles an hour, and when he spurted up he got about from 4 to 6 feet before he was hit. * * * The reason I did not say anything to Mr. Reynolds was because I expected them to stop before they reached the crossing; the reason I thought he would stop was because he was moving slowly, moving in slow speed. I was simply taking a chance that he would stop because I saw other people stop, and we couldn't afford to stop every time we saw an automobile drive up towards the track; they do that every day and stop. That is the reason I didn't say anything to Mr. Reynolds. He was moving at such a slow rate of speed that I thought he would drive up to the crossing and stop, I based my judgment on the rate of speed that he was .going."

Holding that the issue of discovered peril was raised, the court said:

"Under this evidence could it be said that it would have been reasonably apparent to a person of ordinary prudence in the use of ordinary care situated as was the·fireman that those in the automobile were not aware of the approach of the train? If it could, it would be within the province of a jury to say whether it was apparent to the fireman that the driver of the automobile was ignorant of the fact that the train was approaching the crossing. The fireman was looking at the automobile from the time it turned around and·started toward the crossing until it passed in front of the engine and was struck. The·car was only 60 feet from the crossing when put in motion. At the time the fireman first saw it the engineer had already whistled for the crossing. The fact that at a distance of only 60 feet the driver of the automobile put same

in motion with the evident intention of crossing the railroad track would, we think, be evidence from which a jury would be permitted to infer that it occurred to the fireman that the driver of the car had not heard the whistle and was ignorant of the approach of the train.

"If it was known to the driver of the car that the train was approaching, would he have advanced toward the track and again stopped, or would he have remained where he was first seen by the fireman until the train passed? The fireman saw the automobile put in motion, and watched it approach the crossing at a speed estimated as high as 6 miles per hour without diminishing its speed until it ran in front of the train and was struck. From the facts it may also have occurred to the fireman that, if the driver of the car saw the train and desired to do so, he could, by increasing the speed at which he was traveling, cross the track in front of the train without danger, as the train was one-fourth of a mile, or 1,000 feet, from the crossing. His failure to do this might have indicated to the fireman that he did not know the train was approaching.

"At some time while the fireman watched the car approach he may have apprehended that the occupants thereof would be placed in peril. Just at what time it first occurred to the fireman that there was danger to those in the automobile under the facts in evidence, and whether it was when the car was at such distance from the crossing that stopping the train, or diminishing its speed, or blasts from the whistle, in the exercise of ordinary care would have prevented the collision is, we think, an issue of fact."

The facts in the instant case and those in the cited case are strikingly similar, and the question is identical. The comment by the Supreme Court in the cited case, that "at some time while the fireman watched the car approach he may have apprehended that the occupants thereof would be placed in peril. Just at what time it first occurred to the fireman that there was danger to those in the automobile under the facts in evidence, and whether it was when the car was at such distance from the crossing that stopping the train, or diminishing its speed, or blasts from the whistle, in the exercise of ordinary care would have prevented the collision is, we think, an issue of fact," applies with full force to the instant case. It was the fireman's duty, when he discovered deceased approaching the crossing and would likely undertake to cross the track,

to impart this information to the engineer so that he could by the use of the means at hand warn deceased of the danger and thus avoid a collision. He had no right to wait until he was certain that deceased was not going to stop before taking the proper steps to avoid a collision, when he saw deceased going into a place of danger. Hines v. Arrant (Tex.Civ.App.) 225 S.W. 767 (writ refused); Texas & P. Ry. Co. v. King (Tex.Civ.App.) 18 S.W.(2d) 757 (writ refused); Houston E. & W. T. Ry. Co. v. Sherman (Tex.Civ.App.) 10 S.W.(2d) 243; Houston & T. C. Ry. Co. v. Stevenson (Tex. Com.App.) 29 S.W.(2d) 995; Trochta v. Missouri, K. & T. Ry. Co. (Tex.Com.App.) 218 S.W. 1038; Sanches v. San Antonio & A. P. Ry. Co., 88 Tex. 117, 30 S.W. 431. Appellant's witness, Stulting, the engineer on the train, testified that if the train was running late, it was going between 50 and 60 miles an hour. The evidence showed the train left Beaumont at 8:06. Its leaving time was 7:59. So it left 7 minutes late. It reached Nome at 8:31. This distance covered in the 25 minutes of running was 21 miles. That was an average of more than 50 miles an hour. It had not slacked up in speed at the time of the collision. The rate of speed of the train was about 74 feet per second. The fireman testified that deceased was traveling at about 10 miles or less an hour, he did not undertake to say how much less. The depot agent Richardson testified that the automobile was traveling about 8 miles an hour. Eight miles an hour would be less than 12 feet per second. The engineer and fireman said the train was within 45 or 50 feet of the crossing when the fireman "became convinced" deceased was not going to stop and told the engineer to "hold her," and the brakes were instantly applied. This estimate of the distance of the train from the crossing could not be correct for, if the train was going 74 feet per second and deceased less than 12 feet per second and deceased was 15 or 20 feet from the crossing, the train would have passed the crossing before deceased got to it, and there would not have been any collision. We think the jury was justified in believing that the whistle was last sounded at or near the whistling post, some 800 to 1,200 feet back from the crossing, and that the train was some 500 feet from the crossing when the fireman first saw deceased turn from the highway and start to cross the track some 80 feet away. And as the fireman admitted that he saw deceased all the time as he slowly (about 8 miles an hour) drove to-

ward the crossing, from the facts and circumstances known to him, he must have realized the danger into which deceased was driving, and could not speculate or presume on his stopping.

What we have said disposes of the case, and renders discussion of other assignments unnecessary. The judgment should be affirmed, and it is so ordered.

Affirmed.

WALKER, Chief Justice (dissenting).

I concur in all the conclusions of my brethren except their proposition that the *exception* to the court's charge was not sufficient to require the court to submit the issue of unavoidable accident. In Robertson & Mueller v. Holden, 1 S.W.(2d) 570, 571, the Commission of Appeals said, opinion approved by the Supreme Court: "Whether the defect in the court's charge be an affirmative error or mere *omission*, a proper objection pointing out the defect is a sufficient predicate for reversal."

A very interesting note on this proposition by Mr. Jesse M. Davis will be found in Texas Law Review, vol. 15, No. 1, dated December, 1936; also, a note in the same issue of the Law Review page 148. On the 6th of January, the Supreme Court granted a writ of error in Peckham v. Johnson, 98 S.W.(2d) 408, by the Fort Worth Court of Civil Appeals, wherein that court followed the rule in the Holden Case. Up to this time this court has uniformly recognized and enforced the rule in the Holden Case. I do not understand that the Supreme Court in its per curiam opinion in Harris v. Leslie, 96 S.W.(2d) 276, the basis of the second note above referred to, has cleared up the conflict on this point. However, since the issue of unavoidable accident was not raised by the evidence, the discussion of my brethren of this point is not necessary for the decision of the case.