The motion of the state for rehearing is overruled.

PHŒNIX REFINING CO., Inc., v. MULLER.

No. 3173.

Court of Civil Appeals of Texas. Beaumont.

Oct. 18, 1937.

Rehearing Denied Oct. 27, 1937.

Russell & Beaucaire, of San Antonio, for appellant.

Davis, Wright & Perales, of San Antonio, for appellee.

WALKER, Chief Justice.

This was an action in district court of Bexar county by appellee, Alfred Muller, against appellant, Phoenix Refining Company, Inc., for a commission of 5 per cent. on the sale of appellant's refinery in Houston, Tex., to the Bennett Refining Company for the sum of $32,500. Appellee pleaded an express contract by appellant to pay him 5 per cent. commission on the sale price and, in the alternative, a contract whereby it was to pay him a reasonable commission. Appellant answered by demurrers, general denial, etc. Answering special issues, the jury found (1) that appellant employed appellee "to assist in the sale of the Houston refinery," and (2) "agreed to pay him a commission equal to five per cent of the sale price of the refinery." That appellant sold its Houston refinery to the Bennett Refining Company for the sum of $32,500 was admitted by appellant. On the issue of appellee's relation to the sale the jury found (3) that "he was the efficient and procuring cause of the sale of the refinery to the Bennett Refining Company"; and (4) that $1,325 "would reasonably compensate" him "for the assistance * * * rendered by him in the sale of the refinery." By its answer and testimony, appellant presented the following defenses to appellee's cause of action; (a) That appellant employed appellee only "to go to Houston in furtherance of a plan to better the market conditions of gasoline"; (b) that L. R. Hepworth and not appellee "was the sole, efficient and pro-

curing cause in the sale of the refinery to the Bennett Refining Company"; and (c) that appellant terminated appellee's employment "before his efforts were the procuring cause of the sale." These defenses were submitted to the jury by Questions Nos. 5, 6, 7, and found against appellant.

On the verdict of the jury judgment was entered in appellee's favor for the sum of $1,625, a 5 per cent. commission on the sale price of $32,500. Appellant duly perfected its appeal to the San Antonio Court of Civil Appeals; the case is on our docket by the Supreme Court's order of transfer.

Opinion.

We overrule all of appellant's assignments of error on the issue of "variance" between the allegations of appellee's petition and his proof. As its statement under these several assignments, appellant says that appellee alleged that "it agreed to pay him five per cent on the sale price 'to help in the sale of said property'"; while his proof was that the commission was to be paid appellee "if he could sell the plant." Appellant insists that there was a fatal variance between the allegation "to help in the sale" and the proof of a contract "to sell." Under the evidence most favorable to appellee, his contract was "to help" in the sale of the Houston refinery; there was no evidence that he was authorized to make an absolute sale of the property. Appellee testified that in July, 1935, he went to the office of Mr. Raymond Russell, president of the Phoenix Refining Company, in San Antonio, and further as follows (Q. and A. reduced to narrative):

"I went there for the purpose of getting a statement in reference to some purchases I had made. While there he (Mr. Russell) asked me to come in and sit down in his office, and he says, 'You know I am trying to sell that Houston plant', and I says, 'Is that so', and he said he thought I might help him to sell it, and I said, 'I don't know, what makes you think so?' He then said he wanted to sell it, get rid of it, as he needed the money. He further said: 'Muller, if you can sell that plant I will give you five per cent on the sale—that is on the property itself, the refinery, not the inventory on the property itself; * * * You may scare someone up that will buy it.' 'Well', I said, 'Raymond, I have got the time and I will certainly take a whirl at it.' So, I decided to use my own money a little and go over there and see what I could do. He

gave me a list of prospects that he thought might be interested; * * * among which he mentioned Bennett. I went over there (to Houston)—this refinery was at Houston that he wanted to sell * * * As to what was said between us with reference to price and terms, I asked him what he wanted for the plant, * * * and he said, $60,000.00. Well, I knew from what he said that was just a trading figure, and I never used it. With reference to who was to pass upon the sales price,—in reference to price or terms * * * he said: 'You scare up a buyer, you get somebody interested, and I will handle that part of it.' He would handle that part, the selling price and trade."

The clear import of appellee's testimony is that he was to find a purchaser and that Mr. Russell was to close the trade; in other words, that appellee was only "to help" in the sale of the refinery.

■ The evidence satisfactorily supports the jury's finding in answer to question No. 3 that appellee was "the efficient and procuring cause" of the sale of appellant's Houston refinery to the Bennett Refining Company. In an effort to sell the Houston refinery appellee testified, as set out above, that, under an agreement with Mr. Russell, he went to Houston and interviewed several men whose names were given to him by Mr. Russell; at that time Mr. Russell referred him to Bennett Refining Company; that he went to the office of the Bennett Refining Company in Houston and met its manager, Mr. Arnold, and had a long conversation with him, and further, as follows (Q. and A. reduced to narrative):

"Mr. Arnold was very pleasant. I told Mr. Arnold that I came to him with the idea of helping him to make the Houston situation a little better as far as the sale of gasoline was concerned, and I went into details to show him what would be necessary in order to improve it; the retailers were at loggerheads and the refineries were at loggerheads, and I made this clear to Mr. Arnold. * * * After he told me he was going after the gasoline business and give Russell a run for the money, I evolved gradually to him the plan that I had in mind * * * I told him that Russell was a resourceful, energetic and powerful competitor and not to under-estimate him, I also told him that I couldn't see how he could make money in the face of Russell's competition. I also showed him the other picture—that if Phoenix was bought out and the two businesses consolidated, that they would have a much improved situation. I also went into further distribution problems that they had in Houston and showed him that that naturally would improve itself in time. I told him in what way the purchase of the Phoenix plant would improve the situation. I told him in that connection that the logical thing for them to do if they were going to come into the Houston market would be to buy the Russell Phoenix plant; I told him also that if he didn't do it his efforts would probably be futile * * * and when I was ready to leave him he told me that Mr. Bennett would be in town the next day, and he wanted Mr. Bennett to meet me. I told him, the last thing, I said, 'Now, listen Mr. Arnold, I just want to leave this word with you to think about, now is the time to buy Russell out—now; you may not be able to do it later, but you can now, to advantage, waste no time.' I left him, and Mr. Arnold said that he would call me the next day, at 3:00 o'clock at the Rice Hotel, which wasn't done. I was with him several hours. He was to call me at the Rice Hotel the next day at 3:00 o'clock, I stayed in my room to wait for this call and no call came. Mr. Russell was in Houston at this time. The Commission was in Houston on account of this hot oil—Commission from State Senate, investigating hot oil. It was on that occasion that he testified about hot oil. I saw Mr. Russell the next day there in Houston, in his hotel room. I told him with reference to this Bennett Company, I told him I thought Bennett would buy the plant. I told him I had seen him, had an appointment with him at 3:00 o'clock, and I told him Bennett, I thought, would buy the plant. He was very much disturbed at the time. They gave him quite a lot of unfavorable publicity at Houston.

" 'Q. Did he say anything Mr. Muller? A. Yes, but very little.

" 'Q. Well, what did he say? A. I don't recall what he said, except this—in other words, to the effect that that was fine.'

* * * I claim that my influence produced the purchaser. After calling on a number of people suggested by Mr. Russell, and many of them I thought of myself, I recognized, being familiar with the Houston situation, that I had to sell something besides a lot of steel and a going concern that was not making any money, for approximately $100,000.00. I had to sell the

idea so I evolved several plans, and the one I used in the particular case to the purchaser was this: The Bennett people had a refinery operating at that time on the Gulf and had just commenced to make inroads on the Phoenix Company's business, and had up to that time taken one account, the Ray Bogges account, from the Phoenix. Mr. Russell knew about it. It was a contest that was just beginning. At Mr. Russell's suggestion I called on the Bennett people and met Mr. Arnold. Having been in the marketing business a number of years I naturally could size up a situation readily. I went to see Mr. Arnold with the idea in mind to help him make more money out of his new undertaking than he had prospects of doing at that time. Gasoline was retailing for five cents a gallon, plus five cents tax at the time, and had been doing so over quite a period, with no prospect of improvement in sight. I went into that situtation with Mr. Arnold and called his attention to the fact that Mr. Russell was clever, intelligent, resourceful and a severe antagonist, that he was entrenched and established; that in order for them to come into Houston, which they had commenced to do, with Mr. Russell's competition it would be a rather expensive procedure. And I also called his attention to the fact that if there was some way to change the set up a little bit in Houston they should do it. I didn't sell the refinery, I never went there to sell the refinery directly. I wanted to give him the picture that Russell was standing in the way of them making money. I wanted him to see that it was to his interest to buy Russell out. And the last part of my conversation came around to the point, 'Now, look here, why can't you and Russell get together?' I didn't say I had a refinery to sell, I did not say that I was selling it, I did not say I wanted so much money for it. I gave Mr. Arnold the picture of marketing his products at a profit, and I was through."

After appellee had contacted the Bennett Refining Company in the manner detailed above, appellant, without consulting him further or advising him of its plans, sold the Houston refinery to the Bennett Refining Company. The evidence on this issue was to the effect that a few days after appellee had contacted the Bennett Refining Company one L. R. Hepworth, an employee of the Bennett Refining Company, called Mr. Russell by long distance phone from Houston to San Antonio, and discussed with him the sale of the Houston refinery to the Bennett Refining Company. Mr.

Russell went to Houston, and sold his refinery. The evidence was further to the effect that the Bennett Refining Company knew nothing of the desire of Mr. Russell to sell the Houston refining company except as that information was given to it by appellee, and that the Bennett Refining Company had made no plans and had not even thought of buying the Houston refinery until appellee's conferences with Mr. Arnold.

It requires no detailed analysis of appellee's testimony to support the jury's answer to question No. 3. Under instructions from Mr. Russell, he went to Houston expressly to contact the Bennett Refining Company, and to induce the Bennett Refining Company to buy the Houston plant. That very result directly followed from appellee's efforts in behalf of appellant.

There is no merit in appellant's contention that "appellee was not the efficient and procuring cause of the sale," because in his conference with Mr. Arnold he did not represent himself as the agent of the Phoenix Refining Company. Appellee was employed "to help" in the sale of the refinery. He performed his part of the contract by creating, as he testified, "a desire" on the part of the Bennett Refining Company to purchase the Houston refinery. He created that desire, and the sale directly resulted.

■ We overrule appellant's contention advanced by its seventh assignment of error, that appellee had no cause of action because Mr. Arnold testified that appellee "did not mention the refinery to him" and that nothing appellee said to him "had any effect upon his reaching a conclusion with reference to the purchase of the refinery." The only effect of Mr. Arnold's testimony was to raise an issue of fact for the jury as against appellee's testimony.

■ The eighth assignment of error is to the effect that the court erred in submitting special issue No. 3, because there was no allegation in appellee's petition "that he was the efficient and procuring cause, nor any acts alleged from which the court would be warranted in submitting such Issue to the jury." This assignment is overruled. Appellee alleged every essential element of a contract with appellant, making him its agent to sell its refinery.

■■ Appellant requested the court to submit the two following issues:

A. "Do you find from a preponderance of the evidence that R. R. Russell for

Phoenix Refining Company, Inc. advanced money for plaintiff's trip to Houston so that plaintiff might endeavor to bind the independent operators together in a cooperative marketing plan."

B. "Do you find from a preponderance of the evidence that any act or acts of L. R. Hepworth by itself or themselves, brought about the sale of the property."

Question No. A was immaterial and presented no determinative issue. An affirmative answer to that question would not have entitled appellant to a verdict. Question B was properly submitted to the jury by the court's charge as question No. 6: "Do you find from a preponderance of the evidence that L. R. Hepworth was the sole efficient and procuring cause of the sale of the refinery to the Bennett Refining Company?"

Appellee introduced a portion of the interrogatories of the witness Arnold; immediately appellant asked permission to introduce the balance of the testimony of this witness, on the theory that appellee had "in effect, placed the witness on the stand and defendant was at that time entitled to read to the jury all material questions and answers of the witness, the same as though the witness had been actually placed on the stand by the plaintiff and plaintiff had finished his examination of the witness." In denying appellant's motion, the court ruled that it could, at the proper time, introduce the testimony of the witness Arnold; and appellant later did introduce all of the testimony of that witness. There was no error in the court's ruling.

Appellant has many assignments against the argument of appellee's counsel, directed to the fourth special issue, on the ground that it was improper, inflammatory, prejudicial, without support in the record, and informed the jury of the effect of its answer to that question. These objections are all overruled. Every statement made by counsel had affirmative support in the evidence. Thus, counsel commented upon the fact that appellant received $32,500 for its Houston refinery, a fact about which there was no controversy; that Mr. Russell may have wanted the money to bet on horse racing—appellee testified without objection that Mr. Russell told him he needed the money, they were going to hold a race meet and "he needed the money"; that Mr. Russell was involved in the hot oil issue—appellee's testimony supported that argument. There was nothing in the argument

advising the jury of the effect of its answers.

Counsel's argument did not inform the jury of the effect of its answer to question No. 4; but, if the argument was subject to that inference, it was not error, for the reason that any jury of ordinary intelligence would have understood its effect. For this further reason the argument was not subject to the exception; in view of the answers to preceding questions, the answer to question No. 4 was immaterial and did not enter into the court's judgment. Appellant has no assignment that the judgment should have been for only $1,325 instead of $1,625.

Appellant excepted to the argument of appellee's counsel, to the effect that appellant did not pay Mr. Hepworth any commission. The evidence supported, if it did not compel, the conclusion that Hepworth received no commission for his part in the sale. The evidence on this issue was that, after appellee had interviewed Mr. Arnold, Mr. Hepworth, an employee of Bennett Refining Company, called Mr. Russell on the phone and discussed with him the sale of his Houston refinery to the Bennett Refining Company. The evidence was conclusive that Mr. Hepworth was acting for the Bennett Refining Company in making this call. In agreeing upon the sale price, appellant deducted 5 per cent., that is to say, the Bennett Refining Company paid him $32,500, less 5 per cent. There was no testimony that Mr. Hepworth ever received one cent of that money. The inference was clearly raised that appellant and Bennett Refining Company used Hepworth only as "a smoke screen" to avoid paying appellee the commission he was entitled to under the contract testified to by him.

There was no error in counsel's argument on the issue of proximate cause.

Appellant's twenty-fourth proposition is against the following argument of appellee's counsel:

"And the Court submitted to you certain controlling questions, your answers to which will form the judgment in this case. He asked you whether Mr. Russell employed Mr. Muller. Well, we know he employed Mr. Muller to sell that refinery. Mr. Muller went down there to make a sale so he could make some money for himself. The answer to that should be, of course, 'Yes'. Did he agree to pay the commission? He agreed to pay him five per cent commission.

Was Muller the procuring cause of the sale? Now, those questions are important to us Gentlemen, every one of them. Those first three questions under the evidence in this case should be answered 'Yes'. * * *

"I ask you, and I tell you that each one of these questions is important—that you answer these first three questions 'Yes' and that you answer the last three questions 'No'."

Appellee's counsel had argued to the jury the merits of the several issues submitted by the court's charge. It was not error for him to tell the jury that each of the questions was "important"; if they had not been "important," the court would not have submitted them. Nor was it error for him to ask the jury to answer the first three questions "Yes" and the last three questions "No." That was the very purpose of his argument—to induce the jury to answer the questions according to the weight of the testimony as he construed the testimony.

■ For a second reason this argument was not error. These questions were simple, and directed the jury's attention immediately to the determinative issues in the case. Any juror of ordinary intelligence was bound to know the effect of its answers to these several questions. If it be conceded, therefore, that this argument did advise the jury of the effect of its answers, and that by answering the first three questions "Yes" and the last three questions "No" appellee would be entitled to a judgment on its verdict, no error was committed. Where a jury must know the effect of its answers, under McFaddin v. Hebert, 118 Tex. 314, 15 S.W.(2d) 213, argument of counsel so instructing the jury is not reversible error.

■ Appellant insists that the jurors were guilty of misconduct in that, (a) before answering any question, they decided that they wanted appellee to recover and then answered the questions to give effect to that conclusion, and (b) they discussed and considered attorney's fees before reaching their verdict. Only jurors M. L. Horn and C. H. Nienitz testified on the issues raised by this assignment.

Juror Horn testified (Q. and A. reduced to narrative): "My name is M. L. Horn. I was a juror in Muller v. Phoenix Refining Co. During our deliberations on our verdict somebody mentioned attorney's fees but we knocked it in the head right away. We said the Judge said not to discuss it. When we went into the jury room we decided that Mr. Muller was working for Mr.

Russell on a commission basis and we thought he was entitled to the money, or some of it; that was the opinion of the whole bunch of us."

We give the following testimony of this witness in questions and answers:

"Q. After that, state whether you proceeded to answer the questions? A. Well, we answered the questions, and then we got down to how much money we were going to give him.

"Q. And that was what tied you up? A. That was what tied us up.

"Q. That is all.

"Cross-Examination.

"Questions by Mr. Wright:

"Q. The Court charged you to answer each question separately on the evidence bearing on it? A. Yes, sir.

"Q. Did the jury do that? A. Yes, sir.

"Q. And did the jury answer each question the way the evidence authorized that question to be answered? A. Yes, sir.

"Q. That is all.

"The Court: Did the jury take a vote on each question? A. Yes, sir.

"The Court: And answered each in the order in which they were submitted to them? A. Yes, sir, took a vote on each question.

"Recross Examination.

"Questions by Mr. Wright:

"Q. In other words, in passing on the credibility of witnesses in the jury room, the jury simply concluded that Mr. Muller was telling the truth and that Mr. Russell was not? A. Well, it looked that way, yes, sir.

"Q. That is all."

On the issue of attorney's fees, the juror Niemitz testified that "it was vaguely mentioned, but it was not brought up to any discussion."

On the assignment that the jury first decided to render a verdict for appellee and then answered the questions so as to give effect to its conclusion, juror Niemitz testified:

"Q. when you went into the jury room, state what was done in substance by the jurors relative to the right of the plaintiff to recover from the defendant? A. There wasn't anything said at first; we discussed the charge of the Judge first, and it was getting close to the dinner hour, I will state that for your information—do you want it that way?

"Q. Yes, sir. A. We read it over, and that brought out there an opinion.

"Q. What was that opinion? A. That Mr. Muller was entitled to receive the money.

"Q. You answered each question after that? A. Yes, sir; but after we came back.

"Q. This opinion was heard though before you answered the question? A. Yes, sir.

"Cross Examination.

"Questions by Mr. Wright:

"Q. In answering these questions, did the jury answer each one according to the evidence bearing on these questions, and in accordance with the Court's charge? A. You mean each question discussed separately?

"Q. Yes, sir? A. Yes, sir, we discussed them separately, and reviewed it even the second time, went over it again.

"Q. In other words, did the jury review the testimony in reference to each question and answer each question as you thought each question should be answered? A. I don't quite understand you—

"Q. I say, did the jury go over the testimony with reference to each question? A. Yes.

"Q. And then answered the question as they thought the evidence warranted? A. Yes, sir.

"Q. Was each question considered and discussed separately? A. Yes, sir.

"Q. That is all.

"Redirect Examination.

"Questions by Mr. Russell:

"Q. That was after the jury reached the conclusion that the plaintiff was entitled to something? A. Yes."

Under the testimony of these jurors the court was authorized to find that, on retiring to consider their verdict, the first thing the jury did was to read the charge, and then, under questions Nos. 1 and 2, that the jury decided that appellant employed appellee to sell the refinery and agreed to pay him 5 per cent. commission. In other words, the court was authorized to find that the jury, in determining that appellee was entitled to recover, first answered the first and second questions in the charge, and on their answers to these questions decided appellee "was entitled to recover the money." These jurors testified to a careful consideration of the court's charge and to a conscientious effort to answer the questions as they understood the testimony. We think the testimony of these two jurors affirmatively excludes any arbitrary conclusion by the jury that appellee was entitled to recovery, and any effort on their part to answer the questions to give effect to such conclusion. As the jury literally followed the court's charge in returning their verdict, no error was committed.

Questions Nos. 1 and 2 of the court's charge read as follows:

"(1) Do you find from a preponderance of the evidence that Raymond R. Russell, as President of the Phœnix Refining Company, Inc., employed the plaintiff, Alfred Muller to assist in the sale of the Houston refinery in question? Answer 'Yes' or 'No.' If you answer the foregoing question 'No,' then you need not answer the following question. If you answer said question 'Yes,' then answer the following question:

"(2) Do you find from a preponderance of the evidence that Raymond R. Russell, as President of the Phœnix Refining Company, Inc., agreed to pay the plaintiff, Alfred Muller, a commission equal to five per cent of the sale price of the refinery? Answer 'Yes' or 'No.' "

Question No. 7 read as follows:

"Do you find from a preponderance of t evidence that Raymond R. Russell, as Pre dent of the Phœnix Refining Company, Inc, terminated the plaintiff, Alfred Muller's, employment, if any, you have found, before the plaintiff, Alfred Muller's efforts, if any, were the procuring cause, if any, of the sale?"

This question was prefaced by the following instructions: "If you answer Question No. 1 'No,' then you need not answer the following question. If you answer Question No. 1 'Yes,' then answer the following question:"

To the court's charge, appellant reserved the following exception: "This defendant objects to the instructions of the court to the effect that if certain questions be answered affirmatively or negatively as the case may be, then the jury need not answer the following question or questions, because the same is in effect a general charge and informs the jury of the effect of their answers to the several questions and deprives this defendant of a trial by jury upon special issues as contemplated by law, such instructions following and preceding the following special issues."

774

As a general rule, it is error for the court to instruct a jury not to answer a certain question, based on an affirmative or negative answer to a preceding question. Texas & N. O. R. Co. v. Crow (Tex.Civ.App.) 101 S.W.(2d) 274, and authorities therein cited. But that general rule does not condemn as error the court's charge in this case. That portion of the charge excepted to related only to questions Nos. 2 and 7. A negative answer to question No. 1 would have so clearly disposed of the case in appellant's favor that no jury could have been influenced in its answer to questions Nos. 2 and 7. In Mills v. Kellahin (Tex.Civ.App.) 91 S.W. (2d) 1097, 1099, the court said: "As to the second point it may be assumed the conditional submission of the second issue had the effect asserted by appellant but it could not have been harmful. Every person of ordinary intelligence knows a mental incompetent cannot make a valid will. Long before this case was submitted to the jury, every juror upon it knew full well the testamentary capacity of Capt. James was in issue, and if the jury found he did not have such capacity at the time he executed the will such finding would invalidate the same. It would be an unwarranted reflection upon the intelligence of the jury which tried this case to assume they did not know full well the effect of their finding upon the first issue regardless of the conditional submission of the issue of undue influence. The matter presents no error. Speer, Special Issues, p. 501; McFaddin v. Hebert, 118 Tex. 314, 15 S.W.(2d) 213."

Question No. 7 was not on the weight of the evidence.

■ Question No. 3 of the court's charge read as follows: "Do you find from a preponderance of the evidence that the plaintiff, Alfred Muller, was the efficient and procuring cause of the sale of the refinery to the Bennett Refining Company?"

Submitting "efficient cause" and "procuring cause" together in question 3 did not render that question multifarious; nor on the same exception was question No. 6 multifarious. In its charge the court defined "efficient cause" and "procuring cause" as follows: "In connection with the preceding question you are instructed that by the term efficient and 'procuring cause,' as used therein, is meant any act or series of acts set in motion by the efforts of Alfred Muller, if any, which, continuing in an unbroken chain from its or their inception, and without the intervention of any new and independent cause, produces the result of bringing the parties together and continues until the final consummation of the sale, and without which it would not have occurred."

It thus appears from the charge that these terms were not submitted to the jury as independant acts, but as descriptive of the very act which produced the result.

The judgment of the lower court should be in all things affirmed, and it is accordingly so ordered.